Reviewed by the Court.

*Decision will be entered for respondent.*

BITUMINOUS CASUALTY CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

BITUMINOUS FIRE AND MARINE INSURANCE COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2510-69, 2511-69.  Filed October 14, 1971.

*Charles W. Davis, Frederic W. Hickman,* and *Ronald F. Lipp,* for the petitioners.

*Seymour I. Sherman,* for the respondent.

DAWSON, *Judge*: In these consolidated cases respondent determined the following Federal income tax deficiencies against the petitioners:

| BITUMINOUS CASUALTY CORP. DOCKET No. 2510–69 | | BITUMINOUS FIRE & MARINE INSURANCE CO., DOCKET No. 2511–69 | |
|---|---|---|---|
| *Taxable year* | *Amount* | *Taxable year* | *Amount* |
| 1958 | $376, 583. 11 | 1962 | $239, 430. 71 |
| 1959 | 3, 625, 228. 02 | 1963 | 51, 123. 37 |
| 1963 | 896, 973. 96 | 1964 | 68, 341. 74 |
| 1964 | 378, 905. 39 | 1965 | 34, 851. 48 |

Several issues involved in these cases have been resolved by agreement of the parties. The three issues presented for our decision are:

(1) Did Bituminous Casualty Corp. properly include in unearned premiums, as defined in section 832(b) (4) of the Code,[1] its reserves for retrospective rate credits and premium discount, i.e., its reasonable estimates of the portion of the premiums otherwise "earned" at the end of the taxable year which it would be required to return to policyholders pursuant to its retrospective rating and premium discount policies?

(2) Did the Casualty Corp. and the Fire Co. correctly compute their deductions under section 832(c) (11) of the Code by taking into account, pursuant to Treasury regulations, their reserves for policyholder dividends, i.e., their reasonable estimates of the portion of the premiums otherwise "earned" at the end of the taxable year which they would be required to return to policyholders under policyholder dividend resolutions previously adopted?

(3) Was the Casualty Corp. required to restore to income during any of the taxable years in question all or any portion of its reserves for unpaid drafts and checks?

### FINDINGS OF FACT

Many of the facts have been stipulated by the parties. The stipulation of facts and supplemental stipulation, together with the exhibits attached thereto, are incorporated herein by this reference.

Bituminous Casualty Corp. (herein called Casualty) is a stock casualty insurance company organized under Illinois law with its principal office and place of business at Rock Island, Ill. It is a medium-sized company, specializing heavily in workmen's compensation coverage. For each of the calendar years 1958 to 1965, inclusive, Casualty filed its Federal income tax returns on Form 1120, with its corresponding annual statement in the form approved by the National Association of Insurance Commissioners (hereinafter called Annual Statement) for each respective year annexed thereto, with the district director of internal revenue at Chicago, Ill.

Bituminous Fire & Marine Insurance Co. (herein called the Fire Co.) was organized in 1942 under Illinois law as a wholly owned subsidiary

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

of Casualty. At all times here pertinent the Fire Co. has remained such a wholly owned subsidiary and has had its principal office and place of business at the same address as Casualty. Like Casualty, it is heavily involved in workmen's compensation coverage. For each of the calendar years 1962 to 1965, inclusive, the Fire Co. filed its Federal income tax returns on Form 1120, with its corresponding annual statement for each year annexed thereto, with the district director of internal revenue at Chicago, Ill.

In all respects relevant to these proceedings, petitioners' computations of taxable income were the same as their computation of "net income" as reflected in the "Underwriting and Investment Exhibit" of petitioners' Annual Statements, except that (a) for years prior to 1963, the amount reflected as "dividends to policyholders" was reflected as a deduction in computing taxable income in petitioners' tax returns, but as a "loss in surplus" (rather than a deduction from "net income") in the Underwriting and Investment Exhibit of petitioners' Annual Statements, and (b) with respect to the items indicated in Schedule 1 of the returns for the years 1958 through 1962, and in Schedule M of the returns for the years 1963 through 1965, which relate to tax-exempt interest and transactions with respect to securities bearing such interest, to liabilities for deferred compensation which are nondeductible for tax purposes, and to other items which are self-explanatory in the returns.

*Premium Rebates—Retrospective Rate Credits*

Certain policies (herein called retro policies) written by Casualty have provisions under which the amount of "standard premium" (i.e., the premium, before adjustments hereafter described, based on' the rates indicated in the policy) may be adjusted on the basis of the amount of losses incurred with respect to the term covered by the' policy, all pursuant to various retrospective rating "plans" (i.e., formulas) under which policies are written. As applied to a particular policy such formulas may result in a downward adjustment of the premium (in which case a portion of the premium is refunded), in an upward adjustment of the premium (in which case additional premium is collected), or in no adjustment whatever. Under all such formulas the amount of adjustment depends in part upon the amount of "losses incurred" (which may include allocated·loss adjustment expenses, as, e.g., legal and medical expenditures made in connection with such losses) with respect to the term for which the policy is effective. Casualty's retro policies are written on workmen's compensation coverage, sometimes in combination with other coverage.

The final amount of premium adjustment under a retrospective rating plan cannot be computed until substantially after the end of the

policy term because the amount of "losses incurred" with respect to the policy cannot be finally determined for some considerable time thereafter. The amount of "losses incurred" for this purpose includes not only payments made to the claimant, but may also include payments of expense for legal and medical services rendered at Casualty's request, including services requested and rendered well after the term of the policy. It also includes estimates of the amounts which may at some future date have to be paid to the claimant or for such expenses.

As a result, the amount of "losses incurred" with respect to the term covered by the policy changes from time to time as payments are made and estimates are revised, and, except as otherwise agreed between the policyholder and Casualty, is not finally determined until all payments are made and no additional amounts are estimated. Depending upon the terms of the retrospective rating plan and the finality of the policyholder's actual experience, final determination of such "losses incurred" for purposes of the retrospective rating plan and the premium adjustment may occur from 6 months to a number of years after the end of the policy term. In some cases Casualty has made such adjustments as long as 8 or 9 years after the end of the policy term. Except where final determination is made as of 6 months after the policy term, there are typically interim adjustments (subject to later correction) made upon the basis of payments known and estimates made at the time of such interim adjustments.

For all years relevant herein, Casualty has computed a reserve for retrospective rate credits (hereinafter sometimes referred to as retro rate credits). That reserve consisted of its estimate, as of each December 31, of that portion of its earned premium (determined on a prorata basis without regard to any reserves for retro rate credits, premium discount, or policyholder's dividends) applicable to retro policies, which would thereafter be refundable to policyholders as retro rate credits, net after deducting additional premiums collectible under the formulas in such policies. The amounts of such retrospective rate credit reserves, as of December 31 in each of the years indicated, were as follows:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1953 | $349, 670. 75 | 1962 | $1, 510, 899. 00 |
| 1958 | 1, 110, 391. 09 | 1963 | 1, 660, 637. 31 |
| 1959 | 1, 093, 100. 00 | 1964 | 1, 717, 407. 67 |
| 1960 | 1, 232, 030. 00 | 1965 | 1, 947, 666. 11 |
| 1961 | 1, 378, 803. 00 | | |

In each year the amount of the retrospective rate credit reserve entered into the computation of Casualty's reserve for unearned

premium in part 2B on page 7 of its Annual Statements. The amount of such reserve at December 31 of each year was included in column 6 of such part 2B for the calendar year ending with such December 31 and was, accordingly, reflected in column 7 of such part 2B and in column 6 of part 2, page 6, of the Annual Statement. It was also reflected in part 2, page 6, of Casualty's Annual Statement for the succeeding calendar year. In the Annual Statements for 1964 and prior years, it was reflected in column 5 of part 2, and in the Annual Statement for 1965 was reflected in column 2 of part 2.

The effect of the computation procedure described above is that in computing "underwriting income" for each year (for purposes both of section 832 of the Code and of the Underwriting and Investment Exhibit of the Annual Statement), Casualty excluded therefrom an amount equal to:

(1) the reserve for retro rate credits at the end of the year, plus

(2) the amount of retro rate credits paid during the year, minus

(3) the reserve for retro rate credits at the beginning of the year (i.e., at the end of the previous year).

The function of the unearned premium reserve (in which the reserve for retrospective rate credits is included) is to separate from the gross premiums received by the insurer that portion (earned premium) available to the insurer to do with as it chooses from that portion (unearned premium) necessary to meet the insurer's future obligations on its policies. The unearned premium reserve is intended in part to provide for reinsurance of the insurer's policies in the event of its insolvency and to provide for the insurer's continuing obligations in the future on policies now in force, including losses, loss expenses, and the obligation to return premium such as retrospective rate credits.

The development of Casualty's retrospective rate credit reserves through December 31, 1969, is shown in the following table:

| (1)<br>Date, Dec. 31— | (2)<br>Reserve | (3)<br>Actual payments with respect to such reserve subsequent to date indicated net after additional premiums payable | (4)<br>(Understatement) or overstatement of such reserve compared with actual payments (col. 2—col. 3) |
|---|---|---|---|
| 1959 | $1,093,100.00 | $962,090.71 | $131,009.29 |
| 1960 | 1,232,030.00 | 1,601,777.48 | (369,747.48) |
| 1961 | 1,378,803.00 | 1,483,052.18 | (104,249.18) |
| 1962 | 1,510,899.00 | 2,124,787.73 | (613,888.73) |
| 1963 | 1,660,637.31 | 2,246,391.71 | (585,754.40) |
| 1964 | 1,717,407.67 | 2,034,559.83 | (317,152.16) |
| 1965 | 1,947,666.11 | 1,733,978.98 | 213,687.13 |

The aggregate amount of retrospective rate credits paid by Casualty has substantially exceeded the amount of additional payments required from policyholders. Retro policies are designed to produce a net return of premium by the insurer and in each year a net return of premiums (after subtraction of additional premium payments) has been made by the company with respect to policies written under retrospective rating plans.

The amounts of the reserve for retrospective rate credits as of December 31 in each of the years indicated hereinafter, applicable to policies which had *expired* or, in the case of multiple-year policies, applicable to policy anniversary periods which had *expired* within such year, were as follows:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1953 | $165,071.35 | 1962 | $890,307.00 |
| 1958 | 737,096.23 | 1963 | 934,098.00 |
| 1959 | 569,212.11 | 1964 | 995,221.00 |
| 1960 | 762,578.42 | 1965 | 1,148,465.00 |
| 1961 | 791,098.00 | | |

In computing the foregoing amounts, Casualty treated multiple-year policies as a series of individual single-year policies. The term "anniversary period" means the year ending on the policy anniversary date. Casualty's records do not permit a determination of the portion of the above amounts attributable to multiple-year (namely, 3-year) policies. In the absence of detailed records, it is reasonable to allocate any one of the foregoing reserves between 1-year and 3-year policies in the proportion that subsequent payments with respect to such reserve are attributable to 1-year and 3-year policies, respectively. During 1965, the earliest year for which information is available, payments made with respect to the reserve amount indicated at December 31, 1964, were in the following proportions: Payments on 3-year policies—11.7 percent; payments on 1-year policies—88.3 percent. The proportion of 3-year policies was, if anything, less in earlier years than in 1964 and 1965. Accordingly, it is reasonable to assume that the percentage of the above reserves attributable to 3-year policies was no greater than 11.7 percent.

On all retro policies the computation of retro rate credits is governed by formulas contained in retrospective rating plans in general industry use. The retrospective rating plans in effect at all times pertinent are the successors to, and in all important respects the same as, the plans promulgated in 1943, including the 1943 War Department Rating Plan.

*Premium Rebates—Premium Discount*

Certain policies (hereinafter called premium discount policies) written by Casualty have provisions under which a percentage of the

"standard premium" will be refunded to the policyholder pursuant to a schedule of percentage discounts. The percentage discounts indicated in each such schedule are graduated according to the amounts of gross premium (i.e., premium before such discount) generated for the policy term.

Such premium discounts are payable, after expiration of the policy term, in accordance with the applicable percentage discount schedule, regardless of whether the policy is canceled, but if the policy is canceled prior to expiration of the policy term the total premium will (and, therefore, the premium discount percentage applicable may) be less than if the policy had not been so canceled. In addition, since the rate as well as amount of discount is affected by total premiums, and a minimum premium is provided below which no discount is allowable, a cancellation or reduction in coverage may reduce the rate of discount otherwise allowable or eliminate any discount by causing the premium to fall below the minimum provided.

The amount, if any, of the premium discount is dependent solely upon the gross premium generated, and is not related to the loss experience of the policyholder, or to Casualty's expenses with respect to the risks covered by the policy.

For all years relevant herein, Casualty has computed a premium discount reserve. That reserve consisted of its estimate, as of each December 31, of that portion of its earned premium (determined on a prorata basis without regard to any reserves for retrospective rate credits, premium discount, or policyholders' dividends) applicable to premium discount policies which would thereafter be refundable to policyholders as premium discount. The amounts of such premium discount reserves were as follows, as of December 31:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1953 | $111,366.95 | 1962 | $290,896.00 |
| 1959 | 152,095.00 | 1963 | 323,320.00 |
| 1960 | 244,191.00 | 1964 | 399,803.00 |
| 1961 | 227,768.00 | 1965 | 454,602.00 |

In each year the amount of the premium discount reserve entered into the computation of Casualty's reserve for unearned premium in part 2B on page 7 of its Annual Statements. The amount of the premium discount reserve at December 31 of each year was included in column 6 of such part 2B for the calendar year ending with such December 31 and was, accordingly, reflected in column 7 of such part 2B and in column 6 of part 2, page 6, of the Annual Statement. It was also reflected in part 2, page 6, of Casualty's Annual Statement for the succeeding calendar year. In the Annual Statements for 1964 and prior years, it was reflected in column 5 of part 2, and in the Annual Statement for 1965 was reflected in column 2 of part 2.

The effect of the computation procedure described above is that in

computing "underwriting income" for each year (for purposes both of section 832 of the Code and of the Underwriting and Investment Exhibit of the Annual Statement), Casualty excluded therefrom an amount equal to:

(1) the reserve for premium discount at the end of the year, plus
(2) the amount of premium discount paid during the year, minus
(3) the reserve for premium discount at the beginning of the year (i.e., at the end of the previous year).

In determining the deficiencies reflected in the statutory notice of deficiency, respondent allowed a portion and disallowed the remainder of the premium discount reserves as of December 31 of the years 1959 through 1965 included by Casualty in its computation of taxable income. In the case of each such reserve the amount allowed by respondent is the amount of premium discount paid or credited by petitioner subsequent to December 31 of each such year with respect to policies which had *expired* on or before such December 31, which respondent determined to be as follows:

| Reserve at Dec. 31— | Amount allowed | Reserve at Dec. 31— | Amount allowed |
|---|---|---|---|
| 1959 | $37,750.91 | 1963 | $53,587.84 |
| 1960 | 42,751.81 | 1964 | 68,633.74 |
| 1961 | 55,374.88 | 1965 | 149,305.43 |
| 1962 | 52,357.82 | Total | 459,762.43 |

No amount was allowed in respect of premium discount allocable to policies expiring after such December 31. With respect to policies expiring on or before December 31 of each of the years indicated below, the correct amounts of premium discount paid after such December 31 and through December 31, 1969, were as follows:

| Year | Amount | Year | Amount |
|---|---|---|---|
| 1959 | $40,693.24 | 1963 | $53,704.81 |
| 1960 | 40,672.95 | 1964 | 70,987.12 |
| 1961 | 52,827.95 | 1965 | 153,538.07 |
| 1962 | 51,263.22 | Total | 463,687.36 |

The similar amount with respect to 1953 was as follows: 1953—$25,536.76.

The development of Casualty's premium discount reserves through December 31, 1969, is shown in the following table:

| (1) Date Dec. 31— | (2) Reserve | (3) Actual payments with respect to such reserve subsequent to date indicated net after additional premiums payable | (4) (Understatement) or overstatement of such reserve compared with actual payments (col. 2-col. 3) |
|---|---|---|---|
| 1959 | $152,095 | $198,956 | ($46,861) |
| 1960 | 224,191 | 216,592 | 7,599 |
| 1961 | 227,768 | 281,930 | (54,162) |
| 1962 | 290,896 | 300,619 | (9,723) |
| 1963 | 323,320 | 329,145 | (5,825) |
| 1964 | 399,803 | 425,470 | (25,667) |
| 1965 | 454,602 | 605,881 | (151,279) |

For the year 1965, the adjustment in the statutory notice designated "rate credits," increasing taxable income by $204,182.43, reflects in part an adjustment with respect to the premium discount reserve and in part an adjustment with respect to the reserve for retrospective rate credits, as follows:

Premium Discount Reserve—Net adjustment decreasing taxable income by $26,076.01 as a result of a determination that the proper reserves were $68,633.74 as of December 31, 1964 and $149,305.43 as of December 31, 1965. Reserve for Retrospective Rate Credit—Net adjustment increasing taxable income by $230,-258.44 as a result of disallowance of an entire amount of such reserve as of December 31, 1964 and December 31, 1965.

With respect to the year 1961, the statutory notice of deficiency reflects a purported disallowance of a portion of the premium discount reserve, but in determining a net increase to taxable income of $2,-924.31 on account of such disallowance of the premium discount reserves at December 31, 1960 and 1961, an arithmetical mistake was made. The arithmetically correct adjustment, assuming such disallowance, should have been a decrease in taxable income of $9,046.07. With respect to the year 1959 the statutory notice of deficiency reflects an adjustment increasing income which is arithmetically incorrect. If the adjustment is correct in principle, the correct amount of disallowance is $114,344.09, in lieu of $114,884.09.

On December 31, 1965, Casualty's reserve for premium discount was in the amount of $454,602. At that date the amount of premium discount due with respect to expired policies, and the amount which would be payable on unexpired policies even if they were canceled at that date, were as follows:

| | |
|---|---:|
| Expired | $149, 305. 43 |
| Unexpired | 327, 416. 93 |
| Total | 476, 722. 36 |

Thus, on that date, there was a minimum amount which was payable without contingency by Casualty which was in excess of the amount of Casualty's reserve for premium discount. Similar figures for earlier years are not available.

*Premium Rebates—Policyholder Dividends—The Fire Co.*

Certain policies written by the Fire Co. include an endorsement which forms a part of each such policy (hereinafter called "dividend endorsement") providing for dividends. Policies having such an endorsement are herein sometimes referred to as "dividend policies."

The amounts of dividends payable pursuant to such endorsements are not related to the policyholder's loss experience or to the Fire Co.'s expenses with respect to the risks covered by the policy, except in the

case of workmen's compensation policies subject to the jurisdiction of the Coal Mine Compensation Rating Bureau of Pennsylvania, and except as expenses may affect surplus, where the existence of surplus is a condition to the payment of a dividend.

The dividends referred to in the dividend endorsement were the subject of resolutions adopted by the Fire Co.'s board of directors.

For all years relevant herein, the Fire Co. made an estimate, as of December 31, of the amount pertaining to the earned premiums on dividend policies (determined on a prorata basis without regard to any reserves for retrospective rate credits, premium discount, or policyholders' dividends) which would thereafter be payable to policyholders as policyholders' dividends based upon the dividend resolutions previously adopted by the Fire Co. Such estimates are herein sometimes referred to as the "reserves for policyholders' dividends" and are the amounts set forth on page 3, line 11(b), of the Annual Statements of the Fire Co.

Policyholders' dividends described above were reflected in the Fire Co.'s Annual Statements as follows:

(a) Amounts paid or credited as such a dividend during the calendar year are reflected in schedule T, part I (page 37 for years through 1963, page 38 subsequently), and on line 16, exhibit 3, page 12.

(b) The amount of the reserve for policyholders' dividends at December 31 of such year is shown on page 3, line 11(b).

(c) The sum of the amounts referred to in (a) plus the amount referred to in (b) for the current year, less the corresponding amount shown on page 3, line 11(b), of the Annual Statement for the year preceding the current year was reported—

(i) for the years 1962 and prior, on page 4, line 32, and

(ii) for the years 1963 and subsequent, on page 4, line 18A.

During all years here relevant no amounts other than the amounts described in clauses (a), (b), and (c) above, all relating to policyholders' dividends, are reflected in the lines referred to in such clauses. The effect of the foregoing treatment is that for each of the years relevant to this proceeding, Casualty's income tax deduction claimed with respect to policyholders' dividends was computed as follows:

To dividends paid or credited during the year was added an estimate of the amount of dividends declared but unpaid and uncredited at the end of the taxable year (in the amount of taxpayer's yearend dividend reserve for such year) and deducted an estimate of dividends declared but unpaid and uncredited at the beginning of the taxable year (in the amount of taxpayer's yearend dividend reserve for the prior year).

The development of the Fire Co.'s reserves for policyholders' dividends through December 31, 1969, is shown in the following table:

| (1)<br>Date<br>Dec. 31— | (2)<br>Reserve | (3)<br>Actual payments<br>with respect to<br>such reserve<br>subsequent to<br>date indicated | (4)<br>(Understatement)<br>or overstatement<br>of such reserve<br>compared with<br>actual payments<br>(col. 2–col. 3) |
|---|---|---|---|
| 1962 | $460,443.68 | $491,386.18 | ($30,942.50) |
| 1963 | 558,757.85 | 616,038.72 | (57,280.87) |
| 1964 | 695,441.32 | 778,766.37 | (83,325.05) |
| 1965 | 768,048.57 | 795,110.33 | (27,061.76) |

Of the total reserves for policyholders' dividends, the following amounts represented reserves with respect to policies subject to the jurisdiction of the Coal Mine Compensation Rating Bureau of Pennsylvania:

| Reserve at Dec. 31— | Amount | Reserve at Dec. 31— | Amount |
|---|---|---|---|
| 1961 | $27,000 | 1964 | $142,000 |
| 1962 | 103,000 | 1965 | 97,500 |
| 1963 | 114,000 | | |

The reserve for policyholders' dividends at December 31, 1953, was $34,591.96.

For 1964 and prior years no dividends were payable upon any policy on which, on termination of the policy, premiums earned were in an amount less than $500 but in practice the Fire Co. did not write such policies on risks that small. For 1965, no such limitation was in effect.

The amounts of the reserve for policyholders' dividends, as of December 31 in each of the years indicated hereinafter, applicable to policies which had expired prior to such December 31 or in the case of multiple-year policies, applicable to policy anniversary periods which had expired within such year, were as follows:

| Year | Reserve | Year | Reserve |
|---|---|---|---|
| 1961 | $93,163.54 | 1964 | $286,825.14 |
| 1962 | 153,561.90 | 1965 | 355,012.69 |
| 1963 | 175,943.94 | | |

In computing these amounts, multiple-year policies are treated as a series of individual single-year policies. The term "anniversary period" means the year ending on the policy anniversary date. There are no amounts included in the above figures which relate to multiple-year policies under which the amount of the dividend depends upon the policyholders' loss experience.

*Premium Rebates—Policyholder Dividends—Casualty Corporation*

Certain policies (hereinafter "Minnesota Dividend Policies") written by Casualty in the State of Minnesota include an endorsement which forms a part of each such policy (the dividend endorsement) providing for dividends to the policyholder. The dividends for which provision is made in the dividend endorsement were declared prospectively on such policies in May of each year pursuant to resolutions of Casualty's board of directors.

For all years relevant herein, Casualty made an estimate, as of each December 31, of the amount pertaining to the earned premiums on Minnesota Dividend Policies (determined on a prorata basis without regard to any reserve for retrospective rate credits, premium discount or policyholders' dividends) which would thereafter be payable to policyholders as policyholders' dividends based upon the dividend resolutions previously adopted by Casualty. Such estimates are herein sometimes referred to as the reserve for policyholders' dividends and are the amounts set forth on page 3, line 11(b), of petitioner's Annual Statements. At all times, Casualty treated its dividend reserves as binding obligations of Casualty.

Policyholders' dividends with respect to Minnesota Dividend Policies were reflected in petitioner's Annual Statement as follows:

(a) Amounts paid or credited as a dividend during the calendar year are reflected in schedule T, part 1 (page 37 for years through 1963, page 38 subsequently), and on line 16, exhibit 3, page 12.

(b) The amount of the reserve for policyholders' dividends at December 31 is shown on page 3, line 11(b).

(c) The sum of the amounts referred to in (a), plus the amount referred to in (b), with respect to the current year, less the corresponding amount shown on page 3, line 11(b), of the Annual Statement for the year preceding the current year was reported—

(i) for the years 1962 and prior, on page 4, line 32, and

(ii) for the years 1963 and subsequent, on page 4, line 18A.

During all years here relevant no amounts other than those described in clauses (a), (b), and (c) above, are reflected in the lines referred to in such clauses.

For each of the years relevant to this proceeding, Casualty's income tax deduction claimed with respect to policyholders' dividends was computed as follows:

To dividends paid or credited during the year was added an estimate of the amount of dividends declared but unpaid and uncredited at the end of the taxable year (in the amount of taxpayer's yearend dividend reserve for such year) and deducted an estimate of dividends

declared but unpaid and uncredited at the beginning of the taxable year (in the amount of taxpayer's yearend dividend reserve for the prior year), all as reflected in taxpayer's Annual Statements.

The amounts of dividends paid or credited after December 31 of each of the respective years indicated below with respect to the reserve for policyholders' dividends as of such December 31 were as follows:

| Year | Payments through 12/31/69 | Year | Payments through 12/31/69 |
|------|---------------------------|------|---------------------------|
| 1959 | $113,283.84 | 1963 | $153,829.06 |
| 1960 | 108,431.74 | 1964 | 125,764.22 |
| 1961 | 100,778.70 | 1965 | 144,315.34 |
| 1962 | 106,571.90 | | |

At all times pertinent, no dividends were payable by Casualty on any policy upon which, on termination of the policy, premiums earned were in an amount less than $500 but in practice Casualty did not write such policies on risks that small.

### Premium Rebates—Generally

Prior to modification of the Annual Statement form prescribed for 1943, the reserve for retrospective rate credits was included in "unearned premium" but not shown separately in the Annual Statement form. In response to the greatly increased volume of such business during World War II, the following events occurred:

(1) In June 1942, the Association of Casualty and Surety Accountants and Statisticians adopted a report outlining reserving methods for retrospective rate credits which called for maintenance of a reserve for both expired and unexpired policies.

(2) At about the same time the National Association of Insurance Commissioners prescribed an amendment to the Annual Statement form to commence with the form for 1943, under which the inclusion of reserves for policyholders' dividends and premium discount in unearned premium would be indicated in a separate column, without distinction between expired and unexpired policies.

(3) In November and December 1942, the Association of Casualty and Surety Executives and the National Bureau of Casualty and Surety Underwriters, both industry associations, corresponded and met with Treasury and Bureau of Internal Revenue personnel in connection with the request of the association that a Treasury regulation be issued with respect to the tax treatment of such reserves. The association's written request indicated the need for such a reserve in respect of both expired and unexpired policies.

(4) In March 1943, the Treasury promulgated a regulation with respect to the inclusion of retrospective rate credits in unearned

premium. The language of that regulation was identical to the language proposed by the National Bureau of Casualty and Surety Underwriters, except for the addition of a reference to the War Rating Plan, and did not distinguish between expired and unexpired policies.

The practice in the insurance industry has always been to provide reserves for retrospective rate credits and premium discount without distinction between expired and unexpired policies.

That part of a casualty insurer's deductions for "losses incurred" which represents unpaid losses at the close of the taxable year (referred to in Income Tax Regs., sec. 1.832–1(b), as an "actual liability") consists of estimates, is contingent, and commonly varies as much as 15 percent from the amount which the insurer is ultimately required to pay.

### Uncashed Drafts and Checks

Amounts disallowed in the notice of deficiency with respect to unpaid drafts and outstanding checks are the amounts reported by Casualty on lines 18 and 19 of page 3 of its Annual Statements. As of December 31 of each of the years 1959 to 1965, inclusive, the amounts in each of the foregoing reserves were as follows:

| Year | Reserve for unpaid drafts | Reserve for outstanding checks |
| --- | --- | --- |
| 1959 | $750, 821. 70 | $9, 968. 00 |
| 1960 | 879, 012. 72 | 9, 923. 68 |
| 1961 | 981, 416. 15 | 7, 976, 86 |
| 1962 | 1, 148, 834. 50 | 7, 551. 83 |
| 1963 | 1, 253, 021. 12 | 7, 327. 15 |
| 1964 | 1, 600, 085. 16 | 7, 323. 23 |
| 1965 | 1, 645, 985. 47 | 7, 323. 23 |

Casualty issues drafts in payment of claims and claim expenses, such as direct medical payments. Such drafts are typically issued by branch or field offices, with one copy being retained by the field office and another copy sent to the home office claim department. The home office thereupon adds the amount of the draft to the reserve for unpaid drafts by a credit thereto, with a debit to the appropriate loss or expense account (in some cases the home office does not, at the time it receives its copy of the draft, have sufficient information to allocate it to the proper claim or expense file and in such cases an initial debit is made to a "draft suspense" account, until such time as such information is received).

The amount of "reserve for unpaid drafts" (reported on line 18, page 3, of the Annual Statement) is the total of drafts which have been issued for claims and for expenses prior to the date of Annual

Statement and which have not been either paid or escheated to one or more States, from which is substracted the "draft suspense" account referred to above.

Unlike checks, when drafts are presented for payment, Casualty's bank returns the drafts to Casualty for review prior to payment to the bank by Casualty. It is because drafts are thus not automatically a charge upon Casualty's cash account that drafts are credited to its reserve for unpaid drafts rather than Casualty's cash account. Upon payment of the drafts, the reserve account is debited and the cash account is credited.

Casualty has at all times treated its unpaid drafts as liabilities of the company. Casualty has not taken amounts with respect to unpaid drafts into income. Casualty continues to honor drafts presented for payment regardless of the number of years such drafts have been outstanding.

Casualty has no reserve for dormant or old drafts. Casualty's reserve for unpaid drafts is a current and active reserve. The bulk of the reserve is attributable to drafts outstanding less than 1 year. Most of Casualty's drafts are paid within a year of issuance, but some drafts reflected in the reserve continually come in for payment several years after issuance.

Payments made by Casualty in 1970 of 1969 and prior drafts are shown in the following table:

| Year | Number of items | Amount | Year | Number of items | Amount |
|------|------|------|------|------|------|
| 1952 | 84 | $1,974 | 1965 | 2 | $69 |
| 1953 | 59 | 1,104 | 1966 | 14 | 934 |
| 1956 | 1 | 1 | 1967 | 9 | 465 |
| 1957 | 3 | 51 | 1968 | 47 | 7,366 |
| 1959 | 1 | 30 | 1969 | 5,087 | 1,352,801 |
| 1960 | 2 | 6 | | | |
| 1962 | 7 | 84 | | 5,320 | 1,365,120 |
| 1964 | 4 | 235 | | | |

These payments include substantial payments made by Casualty during 1969 under various State escheat laws.

A breakdown as of December 31, 1970, of the items and amounts representing Casualty's then reserve for unpaid drafts is shown in the following table:

| Year of issue | As of Dec. 31, 1970 | | |
|------|------|------|------|
| | Number of items | Total amount | Accumulated totals |
| 1942 | 1 | $10 | |
| 1944 | 2 | 74 | $84 |
| 1945 | 4 | 191 | 275 |
| 1946 | 121 | 1,968 | 2,243 |
| 1947 | 154 | 2,801 | 5,044 |
| 1948 | 174 | 3,113 | 8,157 |
| 1949 | 157 | 2,361 | 10,518 |

| Year of issue | As of Dec. 31, 1970 | | |
| --- | --- | --- | --- |
| | Number of items | Total amount | Accumulated totals |
| 1950 | 171 | $2,346 | $12,864 |
| 1951 | 107 | 1,641 | 14,505 |
| 1952 | 50 | 1,537 | 16,042 |
| 1953 | 175 | 4,293 | 20,335 |
| 1954 | 173 | 3,150 | 23,485 |
| 1955 | 100 | 1,930 | 25,415 |
| 1956 | 405 | 11,290 | 36,705 |
| 1957 | 170 | 4,797 | 41,502 |
| 1958 | 200 | 5,622 | 47,124 |
| 1959 | 237 | 6,436 | 53,560 |
| 1960 | 227 | 7,319 | 60,879 |
| 1961 | 200 | 5,900 | 66,779 |
| 1962 | 236 | 9,012 | 75,791 |
| 1963 | 242 | 10,480 | 86,271 |
| 1964 | 269 | 10,272 | 96,543 |
| 1965 | 266 | 9,322 | 105,865 |
| 1966 | 257 | 8,507 | 114,372 |
| 1967 | 245 | 13,131 | 127,503 |
| 1968 | 229 | 11,370 | 138,873 |
| 1969 | 297 | 22,978 | 161,851 |
| 1970 | 5,665 | 1,382,988 | 1,544,839 |
| Total | 10,534 | 1,544,839 | |

The amounts reflected above are all subject to escheat except for amounts issued prior to August 17, 1951, which Casualty concedes represent income to it in 1968.

In addition, Casualty issues checks for various purposes.

Upon issuance of a check, Casualty follows the normal commercial practice of charging the amount of the check against its cash account.

At one time, Casualty made use of a reserve for outstanding checks into which it sporadically transferred unpaid checks of various ages. This reserve was used for administrative convenience so that checks which were not promptly cashed would not have to be reconciled month after month in the monthly reconciliation of Casualty's cash account. This reserve was always maintained as a liability on Casualty's books. At various times in 1958 and prior years Casualty removed from this reserve and took into income checks which had been outstanding more than 7 years. Use by Casualty of the reserve for outstanding checks was discontinued in 1960.

A breakdown of the items and amounts representing Casualty's reserve for outstanding checks as of December 31, 1965, is as follows:

| Year of issue | Number of items | Amount | Accumulated total |
| --- | --- | --- | --- |
| 1950 | 1 | $2.00 | |
| 1951 | 1 | 2.00 | $4.00 |
| 1952 | 4 | 72.11 | 76.11 |
| 1953 | 2 | 24.59 | 100.70 |
| 1954 | 5 | 708.60 | 809.30 |
| 1955 | 6 | 887.01 | 1,696.31 |
| 1956 | 5 | 441.90 | 2,138.21 |
| 1957 | 10 | 787.96 | 2,926.17 |
| 1958 | 10 | 1,420.93 | 4,347.10 |
| 1959 | 14 | 2,899.00 | 7,246.10 |
| 1960 | 2 | 77.13 | 7,323.23 |
| Total | 60 | 7,323.23 | |

Casualty has, in 1965 and in each year since 1968, filed with the State of Illinois, Annual Reports of Property Presumed Abandoned (hereinafter "Escheat Report").

Items included in the Escheat Reports are published by the State of Illinois and if not claimed by the persons entitled thereto within a specified period are paid by Casualty to the State of Illinois. All drafts and checks issued after August 17, 1951, and before June 30, 1955, which were unpaid to the persons to whom originally issued have been either paid as an escheat to Illinois or some other State or are included in Escheat Reports for which the time of escheat payment has not yet arrived.

Casualty has made payments to the State of Illinois pursuant to its escheat laws, as follows: June 3, 1969—$3,040.86; May 14, 1970—$3,150.26. The foregoing payments included amounts payable to Illinois and all other States, except Michigan, Maryland, and Wisconsin. Direct payments were made to the latter three States in the total amount of $1,148.26. In addition to the amounts paid, Casualty has reported for escheat substantially greater amounts which Casualty expects to pay, in the main, during 1971 following completion of publication and notice requirements of the appropriate escheat laws.

The aggregate amounts of such checks and of claims and expense drafts outstanding on December 31, 1970, which were issued prior to August 17, 1951, is $13,404. Various insurance companies, including Casualty, and other plaintiffs litigated the claim of the State of Illinois that such amounts were subject to escheat under the laws of Illinois, in particular, Ill. Rev. Stat. ch. 141, sec. 116. Such litigation resulted in the decision of the Illinois Supreme Court in *Country Mutual Ins. Co.* v. *Knight*, 40 Ill.2d 423, 240 N.E. 2d 612 (1968).

OPINION

I. *Reserves for premium rebates.*—The first of the two broad issues in dispute concerns the accounting treatment of petitioners' reserves for premium rebates. These reserves relate to three variant forms of rebate plans: Retro rate credits, premium discounts, and policyholders' dividends. The question is the same for each of the three reserves, namely, is it to be taken into account in computing taxable income?

Under each of the three rebate plans, policyholders receive from the insurer, sometime after the end of the policy term, a partial rebate of premium. Because the insurer will be required to return a a significant portion of the premiums to the policyholders under each of the plans, it is required to maintain reserves for those liabilities. In each case, the reserve is an adjustment with respect to the company's

"earned premium," i.e., it represents that fraction of the premiums otherwise deemed to be "earned" which the insurer estimates will have to be rebated.

1. *Three variant forms of rebate.*—The three variant forms of premium rebate are similar in that the reserves for such rebates are all estimates of the amount of the earned premium which the company will be required to return to the policyholder. In addition, they are identical in the way in which those reserves enter into computation of taxable income. In each case the deduction in any taxable year with respect to such items is on an "inventory basis," i.e., the exclusion from income in any year is an amount equal to the amount of such rebates paid during the year plus the reserve at the end of the year minus the reserve at the beginning of the year. This is immediately clear from part 2, page 6, of the Annual Statement form in the case of retro rate credits and premium discount. In the case of policyholders' dividends the deduction is somewhat more complicated to trace through the Annual Statement form, a fact which is attributable to the way in which such dividends historically arose and were treated.

The differences between the three kinds of rebates are primarily with respect to the different kinds of contingencies to which the rebate is subject.

(a) *Retro rate credits.*—The largest of the rebate reserves disallowed by respondent is Casualty's reserve for retrospective rate credits. Under a policy providing for retrospective rating, an adjustment in premium is made after the end of the policy term based upon a formula which reflects two factors: the size of the policy and the policyholder's loss experience. Thus the plan reflects both a quantity discount and an experience adjustment. If the policyholder has been able to control the losses arising under the policy so that the amount of claims to be paid by Casualty is relatively small, the policyholder will receive a partial return of premium—a "retro rate credit." If the amount of the claims arising under the policy is unusually large, the policyholder may be liable to pay an additional premium—a "retro rate debit." Casualty—and the industry generally—provide for retrospective rating obligations through a reserve which reflects the excess of its retrospective rate credit liabilities over the retrospective debits which it will receive. The reserve is known as a reserve for retrospective rate *credits* since the policies are designed to provide in the aggregate a net credit, and always have done so.

Casualty's retrospective rating policies are written under a series of retrospective rating plans which are common to the industry. While these plans differ in certain details, they share all of the basic characteristics outlined above.

(b) *Premium discounts.*—Premium discounts are "quantity discount" rebates given on a variety of policies, principally covering workmen's compensation risks. No loss experience factor is involved. The discount is granted irrespective of the loss experience of the policyholder and irrespective of whether the policy is canceled during its term. For each of the years in issue, respondent purported to disallow that portion of Casualty's premium discount reserve allocable to unexpired policies.

(c) *Policyholders' dividends.*—Policyholders' dividends are rebates primarily intended to provide a single competitive price discount. The use of dividends rather than a lesser price results from the fact that dividends involve less red tape with State regulatory authorities than securing approval of lesser rates. Except for one relatively minor item (dividends paid on coal mine risks in Pennsylvania) dividends paid by the Fire Co. are a flat percentage of earned premium (not graduated) and are unrelated to the policyholders' loss experience. In the years 1964 and prior, dividends theoretically were not payable on policies with earned premium below $500, but in practice the Fire Co. did not write policies entitled to dividends on risks that small. Dividends are not paid on policies canceled in mid-term by the policyholder, but in the event of cancellation by the company, the dividend is still paid. Most of the dividend policies were written in the Fire Co. However, for historical reasons some dividend policies were written by the Casualty Corp. in the State of Minnesota, all of which—unlike the bulk of the policies written in the Fire Co.—were loss related.

2. *Contingency elements in premium rebates.*—Because of the features described, including the necessity to estimate premiums in advance, the reserves for all three kinds of rebates are necessarily contingent and must be estimated.

Where policies are loss related, as in the case of retro policies and certain of the dividended policies, the insurer cannot know what the losses will be at the time the reserve must be estimated, even with respect to expired policies. In the case of retro policies, it may be as long as 8 or 9 years before all of the facts which determine liability will have occurred.

In the case of premium discount policies, the contingency with respect to loss experience is absent, but the amount to be rebated depends upon a *graduated percentage* scale so that the amount of discount cannot be determined until the amount of total premium is determined.

Policyholders' dividends, where nonloss related, are the least contingent of the three types of rebate policies, since the rebate is in terms of a *flat percentage* of the premium and the only contingency is whether or not the policyholder might cancel the policy in mid-term.

3. *Use of rebate reserves is necessary to reflect income accurately.*— The nature of casualty insurance requires accounting rules substantially different from the accounting rules applicable to general commerce.

In commerce generally, expenses come first and income follows. The manufacturer must incur the cost of manufacturing his product before he gets paid for it. The merchant must purchase his inventory before he can resell it.

In the insurance industry, however, the reverse is true. The policyholder pays the insurance company in advance and the insurance company's costs, which are primarily the payment of claims, come afterwards. If the premiums were to be taxed as received and the deductions allowed only as they later became fixed, the result would be to tax very large sums of money as income when in fact those amounts will never really become income because they will have to be paid out to policyholders and other claimants.

4. *"Annual Statement" accounting.*—In the case of insurance companies, special tax accounting rules have been present almost from the beginning. From the inception of the income tax in 1913 until 1921 insurance company income was computed for tax purposes under rules relating to corporations generally. In 1921, however, that system was recognized to be inappropriate and special rules were adopted. There had evolved in the insurance industry prior to 1921 a uniform format for reporting casualty company income. That format had been devised and developed by the insurance commissioners in the various States acting through an association then known as the National Convention of Insurance Commissioners and now known as the National Association of Insurance Commissioners, or sometimes simply as the NAIC. Thus, when the casualty insurance provisions were adopted in 1921, the statute specifically provided that income would be computed on the basis of "the underwriting and investment exhibit" approved by the National Convention of Insurance Commissioners. The substance of that exhibit, although modified and rearranged in some details, has remained essentially the same from 1921 to the present time.

The Annual Statement method of accounting relies extensively on the use of estimated amounts which would be improper under general tax accounting. Thus, for example, instead of taking into income all of the premiums received or accrued, casualty insurance companies take into account only the portion of those premiums which are estimated to be "earned." Similarly, the major deductions from income are "losses" and "loss adjustment expenses," which are again estimated amounts. The deduction of these loss and loss adjustment expense items is fundamentally at odds with the "all events" test: The items

include amounts for liabilities which are not established, but, on the contrary, vigorously contested; they include, in the case of the loss adjustment items, expenses which will not only be paid in the future, but which are attributable to events which will not even occur until the future, including future overhead; and they are so unsusceptible of accurate estimate that Internal Revenue Service rules applicable in certain contexts provide that estimates will be considered in aggregate amounts rather than individually and will not be disturbed if, over a period of years, they are on the average within 15 percent of the final figure.

Since the basic items entering into underwriting income are premiums earned and losses and adjustment expenses, and since it is estimates which must be used to compute the basic items, it is critical that the estimates be the best possible. Thus the reserves in question serve to adjust the estimates of earned premium so that they do not include amounts which the company will never earn, but will have to pay back to its policyholders in the form of premium rebates.

Petitioners herein do not contend that the Annual Statement method of accounting is controlling in every respect for tax purposes. However, the Internal Revenue Code clearly adopts the basic approach of the Annual Statement method in computing underwriting income and that basic approach, so far as it concerns income from premiums and losses from claims, is inconsistent with tax accrual rules applicable to commerce generally.

5. *Statutory provisions relating to premium rebate reserves.*—The statutory provisions for taxing stock casualty insurance companies were adopted in substantially their present form (I.R.C. 1954) in the Revenue Act of 1921. The format of the Code provisions recognizes that the *gross receipts* of a casualty insurer are not synonymous with its *gross income.* In this connection the First Circuit, in *Massachusetts Protective Assn.* v. *United States,* 114 F.2d 304, 312 (1940), noted that:

inclusion [of premium income] in gross income is only justified by the deductions allowed. See Hearings before the Committee on Ways and Means on the Revenue Act of 1918, 65th Cong., 2d Sess., Pt. 1 (1918) 811. * * *

Thus the statutory scheme is to provide in section 832(b) for certain exclusions from gross receipts to reach "gross income," and to provide in section 832(c) for additional "deductions" from "gross income" to reach "taxable income."

Section 832(b)(1) provides that the "gross income" of a casualty insurer shall consist of its "investment income" and "underwriting income" plus certain other items not here relevant, and that such "investment income" and "underwriting income" shall be—

computed on the basis of the underwriting and investment exhibit of the annual statement approved by the National Convention of Insurance Commissioners.

Subsections 832(b)(3) through (6) define "underwriting income" more specifically by describing in words what the Annual Statement in general provides, using Annual Statement terminology. Thus section 832(b)(3) provides:

The term "underwriting income" means the premiums earned on insurance contracts during the taxable year less losses incurred and expenses incurred.

And section 832(b)(4) adds:

The term "premiums earned on insurance contracts during the taxable year" means an amount computed as follows:

(A) From the amount of gross premiums written on insurance contracts during the taxable year, deduct return premiums and premiums paid for reinsurance.

(B) To the result so obtained, add unearned premiums on outstanding business at the end of the preceding taxable year and deduct unearned premiums on outstanding business at the end of the taxable year.

The definitional provisions in subsections 832(b)(3) through (6), including those above set forth, were necessary because the underwriting and investment exhibit of the Annual Statement had several figures for underwriting and several for investment and it was necessary to know which was to be used.

6. *Controlling effect of "Annual Statement" form.*—The extent to which the Annual Statement form controls in the computation of underwriting income and investment income was the subject of considerable litigation prior to revision of the Annual Statement form in 1950. The position of this Court with respect to the issue was set forth in *New Hampshire Fire Insurance Co.*, 2 T.C. 708 (1943), affd. 146 F.2d 697 (C.A. 1, 1945). In that case the issue was whether in computing "underwriting income" the "reinsurance" to be taken into account was all reinsurance or only "authorized" reinsurance, i.e., reinsurance carried with so-called "admitted" reinsurers. Although the Annual Statement was not explicit, the parties stipulated that it was the accepted practice in all States to omit "unauthorized" reinsurance (i.e., reinsurance carried with "unadmitted companies") from "reinsurance" in the computation of underwriting income in the Annual Statement form. The Commissioner contended that the statute, in the definitions with respect to underwriting income presently contained in section 832(b)(3) through (6), made no distinction between reinsurance with "admitted" companies and reinsurance with "unadmitted" companies and, therefore, all reinsurance must be taken into account under the plain and specific language of the statute, which to that extent overrode the more general language in section 832(b)(1)

providing that gross income would be computed "on the basis of the underwriting and investment exhibit of the Annual Statement."

After reviewing the legislative history of the 1921 Act, we concluded that Congress intended to adopt the Annual Statement approach and that in effect the terms "reinsurance" and "unearned premium" should be read in accordance with industry practice to take account of only reinsurance with "admitted companies." We said at pages 722–723:

> It is obvious from the above discussion and explanation that Congress comprehended the completely universal use of the Convention Form; that it conformed the phraseology of the statute to the technical terms appearing in the form; that for Federal tax purposes it adopted bodily the Convention Form and its method of reporting its transactions resulting in income, and that it had a thorough knowledge of the provisions of the form properly safeguarding the interests of the public. The Convention Form does not recognize the petitioner's transactions with unadmitted companies. Such transactions do not enter into its income as set forth on the Convention Form and are not permitted to be included in any of the calculations there appearing.
>
> The entire Federal tax structure is a creature of Congress. That legislative body has laid down generally the basis on which tax must be computed and paid. It has granted complete tax exemption to certain classes of taxpayers. It has allowed credits and deductions in circumstances explicitly defined. It has set up specific standards by which certain taxpayers must be measured in order to ascertain the statutory tax which they shall pay.
>
> Congress has seen fit to enact a special statute governing the imposition of tax upon "insurance companies other than life or mutual * * * in lieu of the tax imposed by sections 13 and 14." It established the Convention Form as the standard for determining the tax on such companies. Therefore, the Convention Form as understood, followed, and applied in the insurance world must control the computation of income of the petitioners, insurance companies other than life or mutual.
>
> * * * Congress has taken the Convention Form as its pattern for this peculiar legislation. It should be followed precisely according to its terms and as employed, accepted and complied with throughout the United States.

The same view was adopted in *United States* v. *Fidelity & Deposit Co. of Maryland*, 177 F.2d 805 (C.A. 4, 1949); but a contrary conclusion was reached in *Commissioner* v. *General Reinsurance Corp.*, 190 F.2d 148 (C.A. 2, 1951); see and compare *Pacific Employers Insurance Co.* v. *Commissioner*, 89 F.2d 186 (C.A. 9, 1937), and *Pacific Insurance Co.* v. *United States*, 188 F.2d 571 (C.A. 9, 1951).

Two things are clear from these lines of cases. First, none of the cases stands for the proposition that general provisions appearing elsewhere in the Internal Revenue Code may be used to modify the Annual Statement method of computing underwriting income. On the contrary, the *New Hampshire Fire Insurance* line of cases holds that Congress intended to follow the Annual Statement form precisely in respect of the items specified in section 832(b)(3) through (6), while the *General Reinsurance Corp.* line of cases holds that Congress intended that the Annual Statement be followed except to the extent

inconsistent with the ordinary meaning of the language in section 832(b)(3) through (6).

Second, it is clear that this Court is not required in the instant cases to choose between the two lines of cases. The result to be reached will be the same under either of them. So far as the reserves for retrospective rate credits and premium discount are concerned, the question is whether or not they are to be included in "unearned premium" as provided in the Annual Statement. Petitioners claim that the Annual Statement treatment is controlling, but, even if it is not, any sensible independent construction of the phrase "unearned premium" would produce a result identical to that in the Annual Statement. The term "unearned premium" is entirely a term of insurance art and can be understood only by reference to industry practice and history. The "unearned premium reserve" (in the words of the Code "unearned premiums on outstanding business") grew up historically as a reserve for insolvency reinsurance, i.e., as the amount required to be set aside out of premiums to compensate some reinsurer if, in the event of insolvency, it should be necessary for the reinsurer to undertake fulfillment of the original insurer's obligations to policyholders for periods subsequent to the date of reinsurance.

Obviously, the retro and premium discount reserves involved here are the kind of obligation for which a reinsurer would require compensation if it were to take over future obligations to a company's policyholders. Thus, these reserves fit clearly within the concept of an "unearned premium" reserve as that concept has developed in the industry.

While the reserves for retro credits and premium discount have historically grown up as part of the "unearned premium" or "reinsurance" reserve, and have consistently been so treated by the Annual Statement, the same is not true with respect to the reserve for policyholders' dividends. There are possible explanations for the historical difference, the most obvious being that no "reinsurance" reserve would ordinarily be appropriate for such items. The liability for such dividends is subject to the existence of surplus at the time of declaration, and in the event of insolvency there would be no surplus and, therefore, no obligation to be reinsured. Thus such dividends are not exclusions in the computation of earned premium, but are, instead, special deductions authorized by section 832(c)(11) of the Code. The regulations under that section provide that reserves for such dividends are to be accounted for in a manner which is identical to that applicable to the reserves for retrospective rate credits and premium discounts.

7. *Reserve for retro rate credits.*—Respondents contends that the reserve for retrospective rate credits is not "unearned premium." He asserts that this proposition is supported by case law and does not

rely on practice and understanding within the industry. None of the cases cited by respondent deals with the issue, and most of them were decided prior to 1943. Retrospective rating policies became significant in volume in connection with defense projects during World War II. Since 1943 the regulations (originally sec. 19.204–2, Regs. 103, and presently sec. 1.832–1 and 4, Income Tax Regs.) relating to the taxation of casualty insurance companies have contained the following language:

In computing "premiums earned on insurance contracts during the taxable year" the amount of the unearned premiums shall include * * * liability for return premiums under a rate credit or retrospective rating plan based on experience, such as the "War Department Insurance Rating Plan," which return premiums are therefore not earned premiums.

This language could hardly be more explicit. It was adopted in 1943, concurrently with the change in the Annual Statement form which for the first time required that the reserves for retro rate credits and premium discount be shown as a component of unearned premium. The record further shows that the change in the Annual Statement in this respect was not a change in prior practice, but simply required insurers to show separately in the Annual Statement that which the New York Insurance Department had previously required be included in the final unearned premium figure.

The record herein shows, and respondent does not contest, that the retrospective rate policies here involved are "rating plan(s) based on experience such as the War Department Insurance Rating Plan." Respondent does not contest the amount of such reserves. The record affirmatively shows them to be computed in a reasonable manner and in line with the amounts which petitioners were ultimately required to pay. Under the circumstances the petitioners contend, and we agree, that respondent's disallowance of the reserves for retro rate credits is erroneous and contrary to the regulations.[2]

In his brief respondent fastens upon the word "liability" and seeks to give it a new meaning which is different from the accrual rules for which the Commissioner has previously contended, i.e., the "all events" test. Respondent argues that the word "liability" refers to an item which is "insufficient for 'pure' accrual" but for which "the taxpayer can at least be said to have an existing liability." The test of such liability is then said be whether—

[2] To the extent that respondent relies upon Rev. Rul. 67–225, 1967–2 C.B. 238, we think the ruling is invalid and erroneous because (1) it is inconsistent with the plain language of the regulations; (2) it seeks to apply an "all events" test to insurance liabilities in a manner inconsistent with the intent of Congress, the Treasury regulations, and established industry practice; (3) its interpretation of the regulations is wrong; and (4) it is contrary to the "legislative history" of the regulations.

All occurrences, i.e., injuries, accidents or other covered events, have taken place, on the basis of which the retrospective premium will ultimately be determined.

In our opinion the argument fails for two reasons:

(a) There is no authority either in the case law or in insurance practice for such a definition of the word "liability." Indeed, respondent's own Rev. Rul. 67–225 would construe the word "liability" differently—again without authority—as including only items which satisfy the "all events" test.

(b) The word "liability" comes not from the Internal Revenue Code but from the 1943 regulations. If the Treasury had intended the word to carry such a new and specialized meaning it surely would have said so.

8. *Reserve for premium discount.*—Premium discount is even less contingent than retrospective rate credits and the reserve for premium discount has, like the reserve for retro rate credits, been treated in the industry and in the Annual Statement as a part of "unearned premium," although the Treasury regulations do not deal specifically with the reserve for premium discount. For the same reasons that the reserve for retro rate credits is properly included in "unearned premium," the reserve for premium discount is, *a fortiori*, also properly included in "unearned premium."

Respondent has allowed that portion of Casualty's reserve for premium discount which is attributable to policy periods expired at the end of the taxable year. Further, even with respect to the earned premium on policies unexpired at yearend, it is possible to determine a minimum amount of premium discount which will in "all events" be payable, since premium discount is a flat percentage of the earned premium. At December 31, 1965, Casualty's total reserve for premium discount was less than the sum of the reserve for premium discount on expired policies which was allowed by respondent plus the minimum amount payable on unexpired policies under the "all events" test. The record discloses that respondent offered to concede the issue with respect to the reserve for premium discount. Petitioner declined to accept that offer, however, because of the continuing importance of this reserve in subsequent years when it might or might not meet the "all events" test in its entirety.

9. *Reserve for policyholders' dividends.*—The reserve for policyholders' dividends is properly taken into account under section 832 (c)(11) of the Code. That section provides, in pertinent part, that there shall be allowed as deductions:

dividends and similar distributions paid or declared to policyholders in their capacity as such, * * *. For purposes of this paragraph, the term "paid or de-

clared" shall be construed according to the method of accounting regularly employed in keeping the books of the insurance company;

This language first appeared in the Revenue Act of 1942. Stock casualty companies commenced to write dividend policies (sometimes known as "participating policies") in competitive response to mutual companies, which rebated premiums in this manner. Prior to 1942 deduction of such dividends by mutual companies was permitted under section 207 of the 1939 Code. With respect to the 1942 legislation, the report of the Ways and Means Committee states:

These deductions are granted under the limitations that obtain for mutual insurance companies other than life, and their effect is to put stock companies on a fair competitive basis with mutual companies in respect of their participating insurance. [H. Rept. No. 2333, 77th Cong., 2d Sess., p. 28.]

Section 19.204–3, Regs. 103, promulgated in 1943 following enactment of the 1942 legislation, provided:

Insurance companies are also allowed a deduction for dividends and similar distributions paid or declared to policyholders in their capacity as such. The deduction is the same as that allowed mutual insurance companies other than life or marine, see section 207(b)(3) and the regulations thereunder.

The regulations referred to for mutual companies under section 207 (b) (3) were section 19.207–3, Regs. 103, which provide in part:

"Dividends to policyholders" is one of the deductions used, together with wholly tax-exempt interest, in determining tax liability under section 207(a)(2). They are also used in section 207(b)(4)(F) in determining the limitation on certain capital losses and in the application of section 117(e). The term "dividends to policyholders" is defined in section 207(b)(3) as dividends and similar distributions paid or declared to policyholders. *It includes amounts returned to policyholders where the amount is not fixed in the insurance contract but depends upon the experience of the company or the discretion of the management.* Such amounts are not to be treated as return premiums under section 207(b)(2). Similar distributions include such payments as the so-called unabsorbed premium deposits returned to policyholders by factory mutual fire insurance companies. The term "paid or declared" is to be construed according to the method of accounting regularly employed in keeping the books of the insurance company, and such method shall be consistently followed with respect to all deductions (including dividends and similar distributions to policyholders) and all items of income.

If the method of accounting so employed is the cash receipts and disbursements method the deduction is limited to the dividends and similar distributions actually paid to policyholders in the taxable year. If, on the other hand, the method of accounting so employed is the accrual method the deduction, *or a reasonably accurate estimate thereof,* for dividends and similar distributions declared to policyholders for any taxable year will, in general, be computed as follows:

To dividends and similar distributions paid during the taxable year add the amount of dividends and similar distributions declared but unpaid at the end

of the taxable year and deduct dividends and similar distributions declared but unpaid at the beginning of the taxable year.

[Emphasis supplied.]

The same language, with conforming changes to 1954 Code sections, has continued through subsequent regulations to date. See secs. 1.832–2 (a), 1.832–5 (a), and 1.822–12, Income Tax Regs.

Several aspects of these regulations should be noted: First, the regulations obviously contemplate a declaration prior to payment and a deduction on the basis of the declaration rather than the actual payment. This is consistent with the testimony of witnesses Lardner and Popp, who said that these dividends were a form of price discount; that it was necessary for the insurer to commit itself to the policyholder in advance as to the amount of the dividends; and that it was the industry practice to declare such dividends as much as a year in advance, which was in fact what petitioners did in these cases.

Second, the regulations provide for deductions with respect to dividends based on "experience" and upon "reasonably accurate estimates." Thus, it is specifically contemplated that deductions are allowable for dividends which have not accrued under the "all events" test.

Third, for taxpayers not on the cash basis, the deduction specified is to be computed on an "inventory basis," i.e., the amount of the deduction is to be the amount of such dividends paid during the year, plus the reserve at the end of the year minus the reserve at the beginning of the year. That is, of course, the same treatment provided by the Annual Statement form not only for policyholders' dividends, but also for retro rate credits and premium discount rebates. Thus, these regulations affirm the fundamental similarity of all three rebate items and are further evidence of the fact that petitioners' accounting for all three items was correct under the Code.

The certainty of petitioners' obligation to pay these dividends was in practical fact as great as the certainty that they would be required to pay retro credits and premium discount. The commitment to pay such dividends was made to policyholders at the time the policies were written and was expressed in advance resolutions declaring such dividends. Under the resolutions the dividends were expressed in percentage of premium and as the premium was earned the obligation became fixed. Pursuant to the resolutions, a reasonable estimate of the amount of such obligation was at all times reflected as a liability in petitioners' Annual Statement balance sheet appearing on line 11(b) of page 3 of the Annual Statement.

Petitioners claim, and we agree, that its accounting for these dividends is correct under the cited provisions of the Code and regulations, which have remained unchanged for nearly 30 years.

## II. *Reserves for Unpaid Drafts and Outstanding Checks*

The second of the two broad issues in controversy relates to Casualty's reserve for unpaid drafts and its reserve for outstanding checks. The reserves were disallowed in their entirety in respondent's notice of deficiency.

The reserve for unpaid drafts included *all* drafts—not just old ones—which had been issued but were still unpaid. The bulk of the reserve represented drafts issued within the current calendar year.

The much smaller reserve for outstanding checks did consist of older checks which were transferred to that reserve account to avoid the nuisance of reconciling them with the monthly bank statements. From time to time Casualty did conclude that certain checks had become so old that payment would never be required and such items were then transferred from the reserve for outstanding checks and credited to income.

While it appears that respondent's action in disallowing the *entire* reserve was improper, the record nevertheless shows that, with one exception, the liabilities reflected in the reserve accounts are liabilities which it is certain that petitioner will pay. It appears from the record that checks and drafts issued in any one year may be presented for payment over a period of a number of years. Most are presented promptly for payment, but the fact that some are not does not mean that they will not be presented at all. If they are presented—no matter how late—Casualty pays them. If the items are not presented for payment, they are subject to escheat, either under the escheat laws of various States or under the uniform escheat statute in effect in Illinois, which picks up any amounts which have not previously escheated to another State. Casualty has regularly reported and paid all such escheat amounts. Under these circumstances petitioner contends that the amounts in the reserves remain an actual, outstanding liability and that it would be unreasonable to treat them otherwise. We agree.

1. *Reserve for unpaid drafts.*—Casualty routinely makes use of drafts for the payment of claims and claim expenses. Casualty uses drafts rather than checks for this purpose because most claim payments are made by field personnel in Casualty's branches. Drafts, unlike checks, are returned to Casualty by its bank before they are finally paid. This makes it possible for Casualty to authorize many employees in the field to issue drafts without exposing Casualty to the liability which would result if those same employees were authorized to issue checks.

Because drafts are reviewed by Casualty prior to making payments, drafts are not credited to Casualty's cash account upon issuance (as checks would be). Instead, the amount of each draft is credited upon

issuance to a liability account entitled "reserve for unpaid drafts." When a draft is paid that account is debited and the cash account is credited in like amount.

The bulk of the amount reflected in its reserve for unpaid drafts is in the nature of "float," i.e., an accrued liability which reflects the commercial reality that there is an unavoidable lapse between the time that a draft is issued and the time when it is presented for payment. While this interval is normally a short one, and most of the amount outstanding in the reserve at any yearend would reflect drafts issued during the previous year, the length of the interval between issuance and payment is not within Casualty's control since it is up to the payee to determine how promptly he will seek payment of drafts in his possession. Casualty's controller testified that the bulk of Casualty's drafts are returned within the year of issuance, but that the remainder come in continually over succeeding years.

Casualty's reserve for unpaid drafts has never before been questioned, and Casualty has not maintained detailed breakdowns of its reserve during the years 1959 through 1965. In the absence of such statistics, Casualty submitted breakdowns from a later period which contain information bearing upon the earlier years.

Petitioner's Exhibit 31 shows the composition of Casualty's reserve for unpaid drafts on December 31, 1970. Of the total amount in the reserve—$1,545,000—drafts issued in 1970 account for $1,383,000, nearly 90 percent of the total, thus corroborating the testimony that the bulk of the amounts in Casualty's reserve for unpaid drafts represents completely current items. Exhibit 31 also shows that the amounts in such reserve in the years before the Court did not represent stale amounts which the company would never pay, since it indicates that only small amounts remain unpaid from such prior years. Exhibit 31 shows that by the end of 1970, unpaid drafts issued in 1965 and prior years amounted to only $106,000. Thus, between the end of 1965 and the end of 1970, Casualty paid $1,540,000 of the $1,646,000 of drafts in the 1965 reserve—over 90 percent of the total.

Exhibit 30, showing a breakdown by year of issue of drafts paid during 1970, corroborates such testimony in showing that payments of drafts continue to be made for years after their issuance. In 1970, payments were made with respect to drafts issued during most of the years before us and for several prior years.

It is clear from the record that Casualty continues to regard unpaid drafts as obligations of the Company even as they grow older. Casualty has never taken unpaid drafts into income or transferred old drafts into a dormant draft account. Casualty has never refused to honor a draft because of the age of the draft.

Moreover, even if the payee never presents a draft for payment, Casualty's obligation remains undiminished. If a draft remains outstanding sufficiently long, the amount of the draft is eventually paid by Casualty under the applicable State escheat law. Casualty's obligations to make payment under the escheat law are both clear and real. With one exception, Casualty is absolutely obligated to pay over all the amounts in its reserve for unpaid drafts to some one—to the payee if the draft is presented or to the State if it is not.

The uniform escheat statute was adopted by Illinois in 1961 (Ill. Rev. Stat., ch. 141, sec. 101 *et seq.*). It required Casualty to escheat to Illinois any draft which has not been paid to the payee or escheated to some other State at the end of 15 years after the draft's issuance. A court proceeding followed, challenging the "retroactivity" of the statute. As a result, the Illinois Supreme Court in *Country Mutual Ins. Co.* v. *Knight*, 40 Ill. 423, 240 N.E.2d 612 (1968), held the statute applicable only to those checks and drafts issued after August 17, 1951. Thus, no escheatable item could even attain the age of 15 years until August 18, 1966. The final decision in *Country Mutual* was issued on September 24, 1968. On December 5, 1968, Casualty filed its first report with Illinois listing items escheatable to the State. Since that time Casualty has regularly reported all drafts as they become escheatable to Illinois or other States. The parties have stipulated that all items included in these escheat reports are paid to claimants if claims are made within a specified period after the report or to the State on items which are not claimed.

Under the Illinois statute, Casualty is now escheating all drafts outstanding 15 years or more which have not been previously paid to the payee or reported for escheat to some other State. Casualty has now reported for escheat all outstanding drafts issued after August 17, 1951, through June 30, 1955. All items reported for escheat have either been paid or will be paid after passage of the necessary period for publication of notice to potential claimants. Casualty has now paid nearly $6,200 of escheatable items to Illinois and about $1,100 to Michigan, Maryland, and Wisconsin. Casualty has also reported an additional $10,000 of escheatable items which remain unpaid because of publication requirements but which Casualty expects to pay in 1971.

It is clear that all drafts not paid to payees must be escheated by Casualty to one State or another. If no other State has made prior claim, Illinois requires payment to it of all of Casualty's drafts unpaid after 15 years regardless of the location of the payee. There is no possibility that any of these drafts will become income to Casualty by remaining unpaid sufficiently long.

2. *Reserve for outstanding checks.*—The situation with regard to Casualty's checks differs from that of Casualty's unpaid drafts prin-

cipally in detail. Casualty issues checks to pay obligations not paid by means of drafts. Upon issuance of a check Casualty follows the normal commercial practice of reducing its cash account by the amount of the check. In years prior to those before the Court, Casualty sporadically transferred unpaid checks of various ages into the reserve for outstanding checks. This was done for administrative convenience, so that checks which were not promptly cashed by the payee would not have to be reconciled month after month in the monthly reconciliation of the cash account.

The reserve for outstanding checks was not a reserve for items which Casualty did not expect to pay. The age at which checks were placed in the reserve varied from 1 to 5 years. The reserve was always maintained as a liability on the company's balance sheet. At various times prior to the years before the Court, Casualty transferred from this reserve and took into income checks which had been outstanding for 7 years or more. No such transfers from the reserve to income were made after enactment of the escheat statute in 1961, the last such transfer having occurred in 1958. Use of this reserve was discontinued in 1960.

In each year from 1959 through 1965, respondent disallowed the entirety of the reserve for outstanding checks. This reserve decreased from a 1959 amount of $9,968 to a 1965 amount of $7,323. Under present escheat laws, Casualty regularly files escheat reports and pays over to the appropriate States amounts with respect to outstanding checks in the same manner that unpaid drafts are escheated.

Accordingly, we conclude that Casualty's reserve for outstanding checks should not be disallowed since it has a clear liability to pay the amounts reflected in that reserve either to the payee or to a State under the appropriate escheat laws.

We have not found any case which has sustained a disallowance by the Commissioner of a reserve of the particular type before us, i.e., unpaid drafts and outstanding checks. Those cases which have required reserves for unpaid liabilities to be restored to income have involved accounts in sharp contrast to Casualty's reserve.

In *Fidelity-Philadelphia Trust Co.*, 23 T.C. 527 (1954), the Court required unclaimed bank deposits to be taken into income. Taxpayer, a bank, acquired the deposits in question in 1934 when it assumed the assets and liabilities of a liquidated predecessor. After further attempts to locate the depositors, the bank in 1948 transferred these accounts, which were dormant and inactive, to its "Undivided Profits or Surplus Account." The Commissioner determined the amount of the transfer to that account to constitute additional income. In sustaining the Commissioner's determination, the Court fixed upon two critical factors not present in Casualty's case.

First, in *Fidelity* the taxpayer itself recognized that its deposits had ceased to be liabilities by transferring the amounts to surplus. In holding that unclaimed deposits may be income to a taxpayer, the Court relied on prior cases which also involved unclaimed amounts transferred by the taxpayers to surplus or an income account. The Court said in this respect (23 T.C. at 529–530) :

[The book entries] mark the point of time when it is reasonable to conclude as a practical matter, on the basis of the present record, that the unclaimed deposits will not in fact be paid over to the depositors,[2] and they represent an assertion of dominion over such deposits by the bank, which has undertaken to deal with them as its own funds. In some of the cases cited above, involving unclaimed deposits or similar situations, the making of book entries was undoubtedly an element that was considered in reaching the results therein. * * * [Footnote omitted.]

No such book entries—no transfers from such reserves to income, to surplus or to other reserve accounts—were made by Casualty in any of the years before the Court, as Casualty never had reason, under the circumstances, "to conclude as a practical matter" that the amounts would not be paid. On the contrary, it was clear that they would be paid, either to the payees or to one or more States.

Second, the Court in *Fidelity* found the escheat law of Pennsylvania, on which the bank relied, had been wholly ignored by the bank, stating in part at pages 528 and 531 :

During the taxable year 1948 and the years prior thereto taxpayer's books, records, and papers were not examined by any officer or agent of the Commonwealth of Pennsylvania, nor did the taxpayer at any time during that same period ever report to the Commonwealth the names and last known addresses of the depositors, or persons entitled to the unclaimed moneys or dividends together with the amounts and nature thereof.

\*  \*  \*  \*  \*  \*  \*

The record does not show that escheat proceedings of any kind have ever been started with respect to those deposits, and for aught we know, none may ever be brought. Meanwhile, the bank has asserted dominion over those deposits and has proceeded to deal with them as its own. * * *

In contrast, the record here clearly shows that Casualty regularly reports and pays over the amounts of its drafts as they become escheatable.

In one case, *Fort Pitt Brewing Co.*, 20 T.C. 1 (1953), affd. 210 F. 2d 6 (C.A. 3, 1954), certiorari denied 347 U.S. 989 (1954), there was no transfer by the taxpayer to surplus or the like which would "mark the point of time when it is reasonable to conclude as a practical matter" that the liabilities would never be paid. However, the case involved partial disallowance of a beer manufacturer's reserve for container deposits received from the manufacturer's customers as security for unreturned containers, and—unlike the present cases— it was virtually certain that some of the amounts would never be

paid, and the Court of Appeals found, on the basis of the evidence, that the portion disallowed was a reasonable approximation of the amounts which would not be paid. And no escheat provisions whatever were applicable.

In its brief Casualty concedes that $13,404, which is the aggregate amount of all checks and drafts still outstanding that were issued prior to August 17, 1951, represents income to it under the *Country Mutual* decision. However, since the State of Illinois continued to claim such amounts until the final decision in *Country Mutual* in 1968, petitioner claims that such amount constituted income in that year. We agree because so long as the claim of the State of Illinois continued Casualty could not assume the amount would not be payable.

To reflect the agreement of the parties on the settled issues and the conclusions reached herein,

*Decisions will be entered under Rule 50.*