T.C. Memo. 2001-304

UNITED STATES TAX COURT

PHYSICIANS INSURANCE COMPANY OF WISCONSIN, INC. AND SUBSIDIARIES,
Petitioner <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3192-99.            Filed November 21, 2001.

<u>Michael R. Schlessinger</u>, <u>Michael A. Clark</u>, <u>Jason K. Francl</u>,
<u>Jay H. Zimbler</u>, and <u>William M. Sneed</u> (specially recognized) for
petitioner.

<u>Avery B. Cousins III</u> and <u>J. Paul Knap</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, <u>Judge</u>:  Respondent determined deficiencies in
petitioner's Federal income taxes as follows:

| Year | Deficiency |
|------|------------|
| 1993 | $8,209,201 |
| 1994 | 1,293,762 |

After concessions, the sole issue for decision is the amount of unpaid losses and loss adjustment expenses (collectively, unpaid losses) that petitioner is entitled to deduct pursuant to section 832.[1]

FINDINGS OF FACT

The parties have stipulated some of the facts, which we incorporate in our findings by this reference.

Petitioner

Petitioner, a Wisconsin corporation, is a property and casualty (P&C) insurance company whose predominant line of business is providing medical malpractice insurance for doctors and hospitals.  From its incorporation in 1986 through the years in issue, petitioner sold insurance only in Wisconsin.

In the 1970s, the health-care industry experienced dramatic increases in medical malpractice lawsuits and resulting damage awards.  In 1975, the State of Wisconsin responded with various legislative reforms, including the creation of the Wisconsin Patient's Compensation Fund (the Fund) to provide Wisconsin health-care providers unlimited malpractice coverage in excess of the primary coverage that each health-care provider was required to carry as a condition of State licensing.  Despite these

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the taxable years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

reforms, continuing increases in the frequency and severity of medical malpractice claims resulted in an affordability crisis for medical malpractice insurance coverage. In the 1980s, certain large commercial carriers withdrew from the market. The Wisconsin State Medical Society proposed the establishment of a physician-owned medical malpractice insurer to provide the requisite primary coverage for its members, resulting in petitioner's incorporation in 1986.[2]

Petitioner's Insurance Policies

On November 1, 1986, petitioner began issuing "claims-made" medical malpractice insurance policies--i.e., policies that cover alleged acts of malpractice for which a claim is filed while the policy is in force, provided that the alleged act of malpractice to which the claim relates occurred after the "retroactive date" (typically the date on which the insured first purchases coverage). Petitioner's policies also included an option to provide "tail coverage"--i.e., coverage for claims relating to events that occurred before the retroactive date. During the years in issue, about 85 percent of petitioner's policies were issued on a claims-made basis; the remainder were "occurrence-

---

[2] Initially, petitioner was capitalized by a $3.25 million contribution from the Physicians Insurance Co. of Ohio (PICO) and a $250,000 contribution from the State Medical Society. During the first 3 years of petitioner's operations, physicians whom petitioner insured were required to purchase stock in petitioner. The capital raised from policyholder-owners was used to redeem nearly all of PICO's interest in petitioner.

based" policies--i.e., policies that cover alleged acts of malpractice committed while the policy is in force, regardless of when the injury is discovered or the claim is reported.

Under petitioner's policies, no formal claim was required to establish coverage within a given policy period. Rather, to establish coverage, it sufficed for an insured to notify petitioner of an incident that might ultimately give rise to a claim. Petitioner referred to such informal notifications as "incident reports".

To discourage frivolous claims and protect the reputations of its physician insureds, petitioner maintained an aggressive defense policy with respect to any claim that was viewed as nonmeritorious. The existence of the Fund, which covered indemnity payments above petitioner's statutorily mandated policy limits, constrained petitioner's risk exposure.[3] Petitioner was statutorily required, however, to defend the interests of the Fund for claims that might involve indemnity payments above the policy limits. Because of the existence of the Fund, petitioner did not secure any reinsurance protection concerning its medical malpractice risks.

---

[3] By Wisconsin statute, the policy limits for property and casualty (P&C) companies issuing malpractice policies were $200,000 per claim arising from an occurrence (and $600,000 aggregate per year) for occurrences before July 1, 1987; $300,000 for each such claim ($900,000 aggregate) for occurrences between July 1, 1987, and June 30, 1988; and $400,000 for each such claim ($1 million aggregate) for occurrences after June 30, 1988.

Annual Statement Requirements

Since its incorporation, petitioner has been regulated by the Wisconsin Commissioner of Insurance (WCI).  The WCI is responsible for, among other things, examining financial practices and market conduct of Wisconsin insurance companies. Petitioner is required to file annual statements with the WCI and to deliver each year a statement of actuarial opinion regarding the adequacy of its reserves.

The National Association of Insurance Commissioners (NAIC), an organization of State insurance commissioners, promulgates standard forms for insurance companies to use in preparing their annual statements.  Insurance companies are required to prepare their annual statements using a system of accounting known as the statutory or annual statement method, which does not necessarily conform to generally accepted accounting principles that govern the preparation of an insurance company's financial statements. Annual statement reporting requires insurance companies to estimate their unpaid losses as of the close of each calendar year.  These estimates of unpaid losses are intended to reflect the insurer's liability for future payments on incurred claims, which include insured events for which a claim has been filed (reported losses) as well as insured events for which no claim has yet been filed (incurred but not reported losses).

Petitioner's Actuaries

Petitioner employed no in-house actuary.  Instead, beginning
in 1986 and continuing through the years in issue, petitioner
retained the firm of Tillinghast-Towers Perrin (Tillinghast) to
perform all its actuarial services, including estimation of its
unpaid losses as part of its reserve reports.

In the course of preparing its various actuarial reports and
analyses for petitioner, Tillinghast representatives met with
petitioner's management and exchanged information periodically.

In analyzing petitioner's unpaid losses, Tillinghast's
techniques and methods changed over time as petitioner's business
grew and matured.  For the years 1987 through 1989, petitioner
lacked historical claims data, and so Tillinghast relied almost
exclusively on industry data to estimate petitioner's unpaid
losses.  Thereafter, it gradually increased its reliance on
petitioner's data.  For the years in issue, Tillinghast relied
heavily on petitioner's data.

In 1991, Tillinghast began to use five specific actuarial
methods (the five methods) in estimating petitioner's unpaid
losses.[4]  It relied upon the five methods consistently throughout
the years in issue.

---

[4] The five specific actuarial methods (the five methods)
Tillinghast used were:  (1) The Bornhuetter-Ferguson method
applied to incurred losses; (2) the Bornhuetter-Ferguson method
applied to paid losses; (3) the development method applied to
incurred losses; (4) the development method applied to paid
losses; and (5) rating model development.

In addition to using the five methods, in arriving at each of its ultimate loss estimates for year ends 1993 and 1994, Tillinghast also factored in (to a greater degree for 1994 than for 1993) ultimate loss estimates that it had selected in the preceding year (prior selections).[5]  Because the prior selections were significantly higher than the estimates indicated by any of the five methods, the effect of factoring in the prior selections was to significantly increase Tillinghast's ultimate loss estimates for each of the years 1993 and 1994.

Tillinghast's point estimates of petitioner's unpaid losses for the years in issue were as follows:

| Year | Tillinghast Unpaid Loss Estimate |
|------|----------------------------------|
| 1993 | $74,027,009 |
| 1994 | $77,029,796 |

Petitioner's Add-Ons to Tillinghast's Point Estimates

David L. Maurer (Maurer), petitioner's treasurer and vice president of finances, was responsible for selecting an estimate of unpaid losses to be recommended to petitioner's board of directors and, following approval, reported on petitioner's annual statement.  For the years in issue, Maurer reviewed each

_____

[5] For example, in its analysis of petitioner's unpaid losses for yearend 1993, Tillinghast first estimated losses by each of the five methods for each report year.  Rather than simply blend these results to select ultimate losses for each report year, Tillinghast factored in the higher estimates of ultimate losses that had been selected in its yearend 1992 analysis.

of Tillinghast's draft reports and concluded that for annual statement purposes petitioner should report estimated unpaid losses that were almost 10 percent higher than Tillinghast's estimates.  Consistent with these recommendations, in its 1993 and 1994 annual statements, petitioner reported estimated unpaid losses that differed from Tillinghast's estimates as shown below:

|  | 1993 | 1994 |
|---|---|---|
| Unpaid loss reserves on petitioner's annual statement | $81,391,000 | $84,559,000 |
| Tillinghast's recommended reserves | 74,027,009 | 77,029,796 |
| Difference | 7,363,991 | 7,529,204 |
| Percentage | 9.95 | 9.77 |

## Tillinghast's Final Reports

Tillinghast's final reports for yearends 1993 and 1994, dated February 10, 1994, and February 8, 1995, respectively, show its original estimates of petitioner's yearend loss reserves as well as the higher amounts of petitioner's "carried" loss reserves, noting the difference between these estimates in both dollars and percentages.  The Tillinghast reports do not otherwise discuss the variations between its loss reserve estimates and the reserves that petitioner carried on its annual statements, which were almost 10 percent higher.

The 1993 and 1994 Tillinghast reports state identically in their prefatory "Conditions and Limitations" sections:

> While we believe that the reserve indications and methods used to determine the reserve indications are reasonable, the development of these indications requires the projection of future contingent events; thus, it is not possible to guarantee that these reserves will prove to be adequate or not excessive.

## Petitioner's Representation Letters to Tillinghast

Before Tillinghast prepared its final reserve reports each year, it required petitioner to provide a representation letter. In connection with Tillinghast's review of petitioner's loss reserves at yearend 1993, petitioner's February 1994 representation letter to Tillinghast confirmed, among other things, that petitioner had not knowingly withheld from Tillinghast any "relevant information which would materially affect the loss and loss adjustment expense reserves", that information furnished to Tillinghast for the calculation of the loss and loss adjustment expense reserves was "complete and accurate", and that Tillinghast had been advised of "all known changes in internal methods or procedures which would materially affect the determination of needed loss and loss adjustment expense reserves". Petitioner's February 1995 representation letter, in connection with Tillinghast's review of petitioner's loss reserves at yearend 1994, was substantially identical.

## Third-Party Reviews of Petitioner's Loss Reserves

### Coopers & Lybrand

The accounting firm of Coopers & Lybrand (Coopers) reviewed petitioner's 1993 and 1994 annual statements. Coopers also

conducted a yearend audit of petitioner's 1993 and 1994 financial statements.

### 1993 Audit

In connection with the Coopers yearend 1993 audit of petitioner's financial statements, Coopers actuary Chris Nelson (Nelson) reviewed a draft of Tillinghast's 1993 report, Tillinghast's 1993 rate review, and certain underlying exposure data from petitioner. On the basis of his review, Nelson concluded that Tillinghast's actuarial methodologies and assumptions in estimating petitioner's unpaid losses were "appropriate and reasonable." In addition, Nelson reviewed petitioner's carried unpaid losses for 1993. Nelson noted that these carried unpaid losses were 9.9 percent above the Tillinghast point estimate. Nelson concluded that this deviation was acceptable from an actuarial perspective, indicating that a reserve range of minus 5 percent to plus 10 percent was common for Tillinghast analyses.

After consulting with Nelson, Coopers's nonactuarial auditors concluded that petitioner's unpaid losses on its 1993 annual statement exceeded the range suggested under Coopers's in-house guidelines. These guidelines specified a mechanical formula which the Coopers auditors used to test whether petitioner's recorded reserves were realistic and meaningful. After further assessment, however, the Coopers auditors

determined that no unpaid loss adjustment was necessary for financial statement purposes.  As stated in an undated Coopers working paper, the somewhat "conservative" nature of petitioner's carried reserves for financial statement purposes was supported by several factors, including the following:

> [Petitioner] is a relatively young company with adequate, but not extremely significant, amounts of historical results to access the adequacy of loss reserves.

> [Petitioner] writes only medical malpractice liability policies * * * [which are] considered extremely volatile and may be subject to significant swings in experience between years.  * * * [Petitioner's] management has stated that as recently as the first quarter of 1993 their reserve projections indicated deficiencies for the first time in Company history.

> Although the impact on current year net income is considered significant, the impact on retained earnings (slightly over 5%) is not considered overly significant.

> The establishment of reserves does not effect [sic] the trend in earnings and does not have a significant impact on management incentive or other bonus plans.

> The Company is not publicly traded and there is currently no active market for the existing outstanding shares.

### 1994 Audit

In connection with Coopers's 1994 yearend audit of petitioner's 1994 financial statements, Coopers actuary Don Skrodenis (Skrodenis) reviewed a draft of Tillinghast's 1994 report, Tillinghast's 1994 rate review, and certain underlying exposure data from petitioner.  On the basis of his review,

Skrodenis concluded that the actuarial methodologies and assumptions used to develop Tillinghast's point estimate were "reasonable". In addition, Skrodenis reviewed petitioner's unpaid loss estimate for 1994. Skrodenis noted that petitioner's carried loss reserves at yearend 1994 were 9.8 percent above the Tillinghast point estimate. Skrodenis concluded that this 9.8 percent "redundancy" was acceptable from an actuarial perspective.

After consulting with Skrodenis, Coopers's auditors determined that Tillinghast's point estimate was likely the midpoint of a range whose width was plus 10 percent or minus 5 percent of the best point estimate. These auditors concluded that petitioner's unpaid losses on its 1994 annual statement exceeded the range suggested under Coopers's in-house guidelines. As in 1993, the 1994 guidelines specified a mechanical formula which the auditors used to test the reasonableness of petitioner's recorded reserves. Ultimately, after further assessment, the Coopers auditors determined that no unpaid loss adjustment was required for financial statement purposes. As stated in an undated Coopers working paper, the somewhat "conservative" nature of petitioner's carried reserve was supported by several factors, including the following:

[Petitioner's] loss * * * reserves fall within the range established by Tillinghast of +10% of their best point estimate.[6]

[Petitioner] is a relatively young company with adequate, but not extremely significant, amounts of historical results to assess the adequacy of loss reserves.

[Petitioner] writes only medical malpractice liability policies.  This line is considered extremely volatile and may be subject to significant swings in experience between years.

A write-down of the current year reserves would effect [sic] the Company's trend in earnings.  Management's incentive or bonus plans are not directly effected [sic] by current year earnings.

The Company is not publicly traded and there is currently no active market for the existing outstanding shares.

A portion of the reserve redundancy is maintained to offset potential tax exposure.

With regard to the last factor listed above, the Coopers working paper noted that as a result of an audit of petitioner's 1991 and 1992 tax returns, the Internal Revenue Service (IRS) had proposed various adjustments, including adjustments arising from a determination that petitioner's loss reserves were excessive. The Coopers working paper notes that for petitioner's taxable years 1991 and 1992, these proposed tax adjustments totaled approximately $6.1 million.

---

[6] This observation is unsupported by the evidence, which does not indicate that Tillinghast ever "established" or communicated the existence of any particular range around its point estimates.

AMI Risk Consultants, Inc.

The WCI retained the actuarial firm AMI Risk Consultants, Inc. (AMI), to review petitioner's 1993 annual statement unpaid losses. In an opinion letter dated November 30, 1994, AMI determined that petitioner's unpaid loss reserves, as reported on petitioner's 1993 annual statement, "Make a reasonable provision, in the aggregate, for all unpaid loss and loss adjustment expense obligations of the Company under the terms of its policies and agreements." In support of this conclusion, AMI conducted its own analysis of petitioner's unpaid losses. The AMI analysis made use of data through June 30, 1994, that was not available to Tillinghast as of January 1994. Like Tillinghast, AMI used paid and incurred loss development methods as well as a paid Bornhuetter-Ferguson method. Unlike Tillinghast, AMI did not factor in any prior selections.[7]

The AMI report estimated petitioner's 1993 unpaid losses at $87,419,000. The AMI report concluded that petitioner's 1993 annual statement unpaid loss reserves were "reasonable", falling within a range that AMI determined had a "low end" of $81,300,000 and a "high end" of $93,539,000. The AMI report stated that its

---

[7] Since AMI Risk Consultants, Inc. (AMI), had not prepared any previous report for petitioner, it would not have had available any prior selections of its own.

conclusion "appears to be consistent" with Tillinghast's 1993 yearend reserves study.

Petitioner's Operating Experience

Petitioner has recorded a surplus every year since it was incorporated in 1986. From its inception through the years in issue, petitioner's ultimate losses have proved each year to be significantly lower than it originally estimated for annual statement purposes in earlier years.[8] For the years in issue, petitioner's redundancies (excesses as determined by hindsight) in its loss reserves were also significantly higher than the average redundancies in loss reserves for the medical malpractice industry as a whole.

With respect to each of the years in issue, A.M. Best Co. (Best)[9] rated petitioner's consolidated financial condition and

---

[8] For example, on its 1994 annual statement, petitioner revised downward its original estimates of unpaid losses for prior coverage years as follows:

| Coverage Year | As Originally Reported | As Estimated on 1994 Annual Statement | Percentage Decrease |
|---|---|---|---|
| 1987 | $3,379,000 | $1,658,000 | 51 |
| 1988 | 10,580,000 | 4,183,000 | 60 |
| 1989 | 17,276,000 | 8,507,000 | 51 |
| 1990 | 25,746,000 | 13,266,000 | 48 |
| 1991 | 29,166,000 | 16,445,000 | 44 |
| 1992 | 27,948,000 | 19,820,000 | 29 |
| 1993 | 30,003,000 | 28,819,000 | 4 |

[9] A.M. Best Co., a rating agency specializing in the insurance industry, rates the financial condition of P&C companies each year.

operating performance as B++ (Very Good).  Best's 1994 report
(with reference to petitioner's 1993 annual statement) indicated
that in 1993 petitioner had recorded its largest net operating
gain of the last 5 years and stated:  "Based on favorable
development of its conservatively stated loss reserves,
[petitioner's] management took down $4.5 million of aggregate
reserves in 1993."  Best's 1995 report (with reference to
petitioner's 1994 annual statement) indicated that petitioner
"has generated very profitable operating results in recent years
as net investment income was enhanced by favorable loss reserve
development" and predicted that petitioner's strong earnings
would continue in the near term, partly because petitioner
"conservatively reserves for its underwriting exposures".

Petitioner's Tax Returns and Respondent's Determinations

On its Federal income tax returns for taxable years 1993 and
1994, petitioner reported undiscounted unpaid losses in the same
amounts shown on its annual statements.

Using a computer program known as Exhibitmaker, which was
developed by Coopers, respondent determined that petitioner's
undiscounted unpaid losses were overstated and should be reduced
to the levels shown below:

| Year | As Reported by Petitioner | As Determined by Respondent |
|------|---------------------------|------------------------------|
| 1993 | $81,391,000 | $46,508,000 |
| 1994 | 84,559,000 | 45,549,000 |

OPINION

The issue for decision is whether petitioner correctly reported its undiscounted unpaid losses for purposes of computing its deduction for losses incurred, pursuant to section 832(b)(5).[10]  Petitioner contends that because it reported the same estimates of unpaid losses on its annual statements and tax returns, and because it estimated these unpaid losses in a reasonable manner, using sound business practices, these estimates should be accorded deference for Federal income tax purposes.  Respondent contends that petitioner's estimates of unpaid losses were not fair and reasonable.

Applicable Law

Petitioner, as a nonlife insurance company, must compute its taxable income under section 832.  See sec. 831.  Under these statutory provisions, gross income includes amounts earned from investment and underwriting income, "computed on the basis of the underwriting and investment exhibit of the annual statement approved by the National Association of Insurance Commissioners".  Sec. 832(b)(1)(A).  Underwriting income is defined as "the premiums earned on insurance contracts during the taxable year less losses incurred and expenses incurred."  Sec. 832(b)(3).

---

[10] For each year in issue, petitioner claimed deductions for increases in its discounted unpaid losses pursuant to sec. 832(b)(5) after discounting the amounts reported as undiscounted unpaid losses.  The parties have not raised any issue regarding the method of discounting these losses.

"Losses incurred" means losses incurred during the taxable year

on insurance contracts and includes increases for the year in

"discounted unpaid losses (as defined in section 846)".  Sec.

832(b)(5)(A).[11]  As defined in section 846(b)(1), "unpaid losses"

generally means "unpaid losses shown in the annual statement

filed by the taxpayer for the year ending with or within the

taxable year of the taxpayer."  Unpaid losses include any unpaid

loss adjustment expenses.  Sec. 832(b)(6).

Taxable income equals gross income, as described above, less

various deductions allowed pursuant to section 832(c).  Sec.

---

[11] Sec. 832(b)(5)(A) provides in relevant part:

In general.--The term "losses incurred" means losses
incurred during the taxable year on insurance contracts
computed as follows:

> (i) To losses paid during the taxable year, deduct
> salvage and reinsurance recovered during the taxable
> year.

> (ii) To the result so obtained, add all unpaid
> losses on life insurance contracts plus all discounted
> unpaid losses (as defined in section 846) outstanding
> at the end of the taxable year and deduct all unpaid
> losses on life insurance contracts plus all discounted
> unpaid losses outstanding at the end of the preceding
> taxable year.

> (iii) To the results so obtained, add estimated
> salvage and reinsurance recoverable as of the end of
> the preceding taxable year and deduct estimated salvage
> and reinsurance recoverable as of the end of the
> taxable year.

832(a).  One of the deductions allowed is for "losses incurred"
as defined in section 832(b)(5).[12]  Sec. 832(c)(4).

The applicable regulations, which have remained
substantively unchanged since their promulgation in 1944, require
the taxpayer to establish that its estimate of unpaid losses is
"fair and reasonable" and represents "only actual unpaid losses."
Sec. 1.832-4(b), Income Tax Regs. (the applicable regulations);
see State of Md. Deposit Ins. Fund v. Commissioner, 88 T.C. 1050,
1059 (1987).  The applicable regulations provide as follows:

> (5)  In computing "losses incurred" the
> determination of unpaid losses at the close of each
> year must represent actual unpaid losses as nearly as
> it is possible to ascertain them.
>
> (b)  Losses incurred.  Every insurance company to
> which this section applies must be prepared to
> establish to the satisfaction of the district director
> that the part of the deduction for "losses incurred"
> which represents unpaid losses at the close of the
> taxable year comprises only actual unpaid losses.  See
> section 846 for rules relating to the determination of
> discounted unpaid losses.  These losses must be stated
> in amounts which, based upon the facts in each case and
> the company's experience with similar cases, represent
> a fair and reasonable estimate of the amount the
> company will be required to pay.  Amounts included in,
> or added to, the estimates of unpaid losses which, in
> the opinion of the district director, are in excess of
> a fair and reasonable estimate will be disallowed as a
> deduction.  The district director may require any
> insurance company to submit such detailed information
> with respect to its actual experience as is deemed

---

[12] Although such a deduction would appear potentially
duplicative of losses incurred that are taken into account in
determining the underwriting income component of gross income
under sec. 832(b)(3), the statute specifically prohibits the same
item from being deducted more than once.  See sec. 832(d).

necessary to establish the reasonableness of the
deduction for "losses incurred." [Sec. 1.832-4(a)(5)
and (b), Income Tax Regs.]

Petitioner does not dispute the validity of the applicable

regulations but argues that they must be construed so as to

accord deference to the unpaid loss estimates reflected on the

taxpayer's annual statement, provided the taxpayer has used "good

faith business judgment" in preparing those estimates.

Petitioner's contention is at bottom a rehashing of long-rejected

arguments that the Code reflects a congressional expectation that

the estimates of unpaid losses used for tax purposes should

conform to the precise figures shown on the annual statement.  In

rejecting such arguments and upholding the validity of the

applicable regulations, the Court of Appeals for the First

Circuit stated:

> Congress's requirement that the N.A.I.C. [annual
> statement] form be followed as the only acceptable
> method for computing an insurance company's gross
> income * * * [provides] no support * * * for the
> contention that the mere inclusion of certain figures
> on the congressionally-approved annual statement can
> prevent the Commissioner's adjustment for the purpose
> of identifying tax deficiencies. * * * [Hanover Ins.
> Co. v. Commissioner, 598 F.2d 1211, 1217 (1st Cir.
> 1979), affg. 69 T.C. 260, 272 (1977).]

The Court of Appeals for the First Circuit noted that accepting

such a contention would be "tantamount to a sanctification of the

estimated figures as well as the form itself, no matter how

unfair or unreasonable."  Id. (quoting Hanover Ins. Co. v.

Commissioner, 65 T.C. 715, 719 (1976)); see also Pac. Employers

Ins. Co. v. Commissioner, 89 F.2d 186, 187 (9th Cir. 1937) ("While the amount of a reserve set up in the [annual statement] exhibit might coincide with the amount of 'losses incurred' as computed according to the statute * * *, the mere fact that the reserve is designated for 'losses incurred' does not establish that the amount of such reserve is the amount of 'losses incurred' within the meaning of the federal statute."), affg. 33 B.T.A. 501 (1935); Hanover Ins. Co. v. Commissioner, 65 T.C. at 719.[13]

---

[13] Petitioner cites various cases to support its contention that the Code requires conformity between the estimates of unpaid losses shown on its annual statement and on its tax return. As this Court has previously stated in rejecting similar arguments, "the cited cases which held the annual statement to be conclusive did not involve the reasonableness of the estimated figures appearing on such statement, but rather the format or methodology of such statement". Hanover Ins. Co. v. Commissioner, 65 T.C. 715, 719 (1976). For instance, N.H. Fire Ins. Co. v. Commissioner, 2 T.C. 708 (1943), cited by petitioner, addressed the issue of whether certain reinsurance transactions should be taken into account, and Bituminous Cas. Corp. v. Commissioner, 57 T.C. 58 (1971), addressed the issue of whether the taxpayer correctly deducted reserves for policyholder dividends, in accordance with annual statement methodology. Similarly, in Sears, Roebuck & Co. v. Commissioner, 972 F.2d 858 (7th Cir. 1992), affg. in part and revg. in part 96 T.C. 61 (1991), the Court of Appeals for the Seventh Circuit held that the taxpayer was entitled to rely upon the annual statement method of accounting for losses on certain mortgage loans. The Court of Appeals suggested, however, that the precise figures shown on the annual statement were not conclusive, stating that on remand the Tax Court was free to consider the Commissioner's argument that the taxpayer's returns for the years in issue "did not use a proper case-based method of approximating its loss reserves." Id. at 868.

In Hanover, 65 T.C. at 719, this Court concluded that the applicable regulations were deemed to have received congressional approval and acquired the force of law by virtue of having been "long continued without substantial change, applying to unamended or substantially reenacted statutes". This tacit congressional approval was made overt when, as part of the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1023(c), 100 Stat. 2085, 2399, Congress added section 846 (requiring that unpaid losses be discounted to reflect the time value of money for claims that would not be paid until future years). In explaining these changes, the conference report accompanying this legislation described prior law as follows:

> The amount of the deduction for losses incurred must be reasonable. See Reg. sec. 1.832-4(b) and Hanover Insurance Co. v. Commissioner, 598 F.2d 1121 (1st Cir. 1979), cert. denied, 444 U.S. 915. Thus, under present law, the Internal Revenue Service may review, and, if appropriate, adjust the amount of the deduction for unpaid losses and unpaid loss adjustment expenses. [H. Conf. Rept. 99-841 (Vol. II), at II-357 (1986), 1986-3 C.B. (Vol. 4) 1, 357.]

Petitioner argues that various technical aspects of certain 1986 and 1990 Code amendments relating to P&C companies "continued, and in some ways strengthened, deference to the Annual Statement". Without a protracted discussion of petitioner's highly technical arguments in this regard, suffice it to say that we have reviewed them carefully and find them unpersuasive. Even if we were to assume, arguendo, that Congress

demonstrated an intent to "continue" deference to the annual statement, Congress also explicitly stated its understanding, as described above, that such deference does not preclude the IRS from adjusting the estimates used on the annual statement. We are unconvinced that Congress intended to "strengthen" deference to the annual statement by expanding it beyond the limits reflected in the applicable regulations and judicial precedents, as expressly referenced in the legislative history.

The applicable regulations "give notice to the taxpayer that the Code will be enforced", by restating the principle that taxpayers must prove their entitlement to deductions. Hanover Ins. Co. v. Commissioner, 598 F.2d at 1219. These procedural aspects of the applicable regulations are consistent with general burden of proof concepts that obtain in this Court. Whether a taxpayer's estimates of its unpaid losses are fair and reasonable is essentially a valuation issue and thus a question of fact. Hanover Ins. Co. v. Commissioner, 69 T.C. at 270. The burden of proof is upon the taxpayer. Id.; see Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Pittman v. Commissioner, 100 F.3d 1308, 1313 (7th Cir. 1996), affg. T.C. Memo. 1995-243.

Consistent with the requirements of the applicable regulations, this Court has stated that when the annual statement methodology is predicated on estimates, those estimates must be the "best possible." Bituminous Cas. Corp. v. Commissioner, 57

T.C. 58, 78 (1971); <u>Minn. Lawyers Mut. Ins. Co. v. Commissioner</u>,
T.C. Memo. 2000-203.  This does not mean that there is (or could
be, except in hindsight) a single "correct" estimate.[14]  It does
mean, however, that the taxpayer must be prepared to objectively
validate that the methods and assumptions it relied upon to make
its estimate are reasonable.  See <u>Minn. Lawyers Mut. Ins. Co. v.
Commissioner</u>, <u>supra</u> (the taxpayer failed to establish the
necessity or appropriateness of a bulk "adverse development
reserve" that its management established as an addition to the
case reserves determined by its claim department); cf. <u>Vinson &
Elkins v. Commissioner</u>, 99 T.C. 9, 57 (1992) (in the context of
pension plan regulation, the section 412(c)(3) requirement that
actuarial estimates be reasonable and offer the actuary's "best
estimate" of actuarial experience does not connote a single "best
estimate" but instead requires validation of actuarial
assumptions in choosing a reasonable range and in selecting a
value within the range), affd. 7 F.3d 1235 (5th Cir. 1993).

<u>The Expert Witnesses</u>

Both parties called expert witnesses to offer their opinions
regarding the reasonableness of petitioner's unpaid loss
estimates.  We evaluate expert opinions in light of all the

---

[14] For example, this Court has rejected an argument that the
midpoint of an actuarially sound range is the only fair and
reasonable estimate.  See <u>Utah Med. Ins. Association v.
Commissioner</u>, T.C. Memo. 1998-458.

evidence in the record, and we may accept or reject the expert testimony, in whole or in part, according to our independent evaluation of the evidence in the record.  See Helvering v. Natl. Grocery Co., 304 U.S. 282, 295 (1938); Malachinski v. Commissioner, 268 F.3d 497 (7th Cir. 2001); Estate of Davis v. Commissioner, 110 T.C. 530, 538 (1998).

Petitioner offered expert testimony of Owen Gleeson (Gleeson), Robert Sanders (Sanders), and James Hurley (Hurley).  Petitioner called Hurley to rebut certain conclusions of respondent's experts.  Respondent offered expert testimony of Frederick Kilbourne (Kilbourne) and David Otto (Otto), each affiliated with the Kilbourne Co., who jointly submitted the expert report of the Kilbourne Co. on behalf of respondent.

### Owen Gleeson

Gleeson analyzed the reports that Tillinghast prepared for petitioner for 1993 and 1994.  He concluded that Tillinghast's reserve analyses were performed in a reasonable manner, employing methodologies that were "appropriate to the lines of business being analyzed."  In particular, he opined that in estimating unpaid losses for each of the years 1993 and 1994, Tillinghast appropriately gave weight to the prior year's selected ultimate losses.  Gleeson opined that it was reasonable for petitioner to rely upon the Tillinghast reports.  He did not specifically address the appropriateness of petitioner's almost 10-percent

addition to Tillinghast's point estimates of unpaid losses. Gleeson offered no independent estimates of petitioner's unpaid losses for either year in issue.

Robert Sanders

Sanders opined that the unpaid claim liabilities that petitioner established for the years in issue were "reasonably stated based on facts known at the time." He opined that Tillinghast used appropriate methodologies and that its point estimates of petitioner's unpaid losses for the years in issue were "reasonable estimates."

Sanders opined that it was reasonable for petitioner to estimate its unpaid losses at amounts almost 10 percent above Tillinghast's point estimates because he believed it was reasonable to imply a range around the Tillinghast point estimate of plus or minus 10 percent. In support of this conclusion, Sanders cited various factors, including: (1) The historically volatile nature of the medical malpractice insurance industry, leading to inherent uncertainty in estimates for this line of business; (2) petitioner's "relative immaturity"; and (3) "growing evidence" of a "deteriorating claims environment". His report also lists various "relevant factors that could impact * * * [petitioner's] exposure to loss that were not explicitly recognized in Tillinghast's actuarial methods", including, inter alia, the size of the company, the lack of geographic spread of

risk, and increased claims and litigation being threatened against petitioner.

Sanders testified that he knew of no actuarial standard of practice or guideline that suggests a 10-percent tolerance on either side of a best estimate, stating that it was a "very judgmental area."

To prepare his report, Sanders examined petitioner's annual statements for 1993 and 1994; Tillinghast's yearend 1993 and yearend 1994 reports; Tillinghast's rate reviews prepared in October 1993 and September 1994; reports drafted by respondent's experts; and various publicly accessible documents and filings. Sanders never met with Tillinghast personnel to discuss Tillinghast's reports, however, nor did he review any of Tillinghast's pre-1993 reports for petitioner or any of Tillinghast's working papers beyond the exhibits supporting Tillinghast's reports.

### Kilbourne and Otto

In their joint report, Kilbourne and Otto concluded that petitioner's estimates of its unpaid losses for 1993 and 1994 were too high. They stated that they had reviewed Tillinghast's reports and work papers and had concluded that Tillinghast's work "violates professional actuarial standards then in place", particularly as regards its reliance upon "prior selections". They also opined that petitioner's almost 10-percent add-ons

"contradict the actuarial work done by Tillinghast." On the basis of their independent analyses, Kilbourne and Otto concluded that fair and reasonable estimates of petitioner's unpaid losses were $50 million for 1993 and $39 million for 1994.

Kilbourne and Otto also reviewed the AMI report and concluded that it relied upon "erroneous calculations and unsupportable assumptions". They stated that if these defects had been cured, the results of the AMI analysis would corroborate their own conclusions.

<u>James D. Hurley</u>

The Hurley rebuttal report responded to three criticisms that Kilbourne and Otto made of the AMI analysis: (1) The use of incorrect premium data in AMI's application of the Bornhuetter-Ferguson actuarial method; (2) inappropriate interpolation of loss development factors in AMI's application of the paid loss development actuarial method; and (3) inappropriate selection of factors generally in the AMI analysis.

Hurley concluded that the first criticism noted above was valid and that if the AMI analysis were adjusted to correct this error, AMI's point estimate of petitioner's 1993 unpaid losses should be reduced from $87,419,000 to $82,544,000. Hurley concluded that the second-mentioned criticism "involves a matter of actuarial judgment" but stated nonetheless that if one were to adjust the AMI report for this issue as well as the first-

mentioned issue, AMI's point estimate of petitioner's 1993 unpaid losses should be reduced to $71,915,000. Hurley concluded that the third-mentioned criticism "involves purely actuarial judgment" and offered no conclusion as to how adjusting for this issue might affect the AMI point estimates.

Analysis

On the basis of all the evidence in the record, we conclude that petitioner has failed to establish that it made fair and reasonable estimates of its actual unpaid losses for the years in issue. In particular, petitioner has failed to establish that its add-ons of almost 10 percent to Tillinghast's point estimates were reasonable or appropriate.

On brief, petitioner argues that its management's decisions to increase Tillinghast's point estimate were "not actuarial in nature" but instead were based on certain "qualitative concerns", particularly regarding "the basic actuarial assumption that past experience will replicate itself in the future." Consequently, petitioner argues, the 10-percent add-ons resulted in "an appropriate expression of conservatism based on the implied range around Tillinghast's unchanged point estimate."

Petitioner offered no evidence to show how it arrived at the precise amounts of its add-ons to Tillinghast's point

estimates.[15]  Petitioner offered no contemporaneous documentary evidence supporting the basis for its add-ons to Tillinghast's point estimate.  Petitioner introduced into evidence an undated and untitled document that Maurer contends is a list of "qualitative factors" that he relied upon to justify petitioner's increments to Tillinghast's point estimates.[16]  Petitioner has not established, however, that this list, which Maurer created after the fact, relates to the years in issue.[17]  Consequently, the list is of little probative value.  Even if we were to assume, for sake of argument, that the list accurately reflects factors that petitioner contemporaneously relied upon in arriving at its add-ons to Tillinghast's point estimates, petitioner has not established that these factors do not duplicate factors that

---

[15] Although David L. Maurer (Maurer) testified that he selected his estimates of unpaid losses as a point that was "ten percent above Tillinghast's initial point estimate", his testimony was vague and evasive as to why the unpaid loss estimates were not in fact exactly 10 percent greater than Tillinghast's point estimate, but rather 9.95 percent greater in 1993 and 9.77 percent greater in 1994.

[16] The list notes the following "qualitative factors":  A trend toward increased claims against corporations; possible liability to the Wisconsin Patients Compensation Fund for settlements or bad faith claims; turnover in clients; pending tort reform legislation; greater uncertainty with "new states" and other lines of business recently offered; and increased litigation resulting from petitioner's aggressive claims defense.

[17] Maurer testified that he did not recall when he prepared the list, but he believed it was in 1997.  He testified that he did not "recall exactly what period of time * * * [the list] relates to".  According to his testimony, he spent 10 or 15 minutes putting this document together.

Tillinghast had already considered in its actuarial analyses.[18] To the contrary, Maurer testified that "many of these items were discussed with Tillinghast at one time or another." Maurer testified that Tillinghast "did know, in general terms, about some of the factors we were considering" in arriving at their increments to Tillinghast's point estimates. Maurer testified that although he looked at the Tillinghast reports, "I did not look specifically at their methodologies or their selections". In his testimony, Maurer was unable to confirm that Tillinghast ever checked to see whether the "qualitative factors" might have already been factored into the Tillinghast point estimates.

In its representation letters to Tillinghast, petitioner represented that it had disclosed to Tillinghast all factors that would materially affect loss reserves. Kurt Reichle (Reichle), Tillinghast's appointed actuary for petitioner during the years in issue, testified that Tillinghast relied on these letters to be accurate and complete and stated that he could not recall that

---

[18] Moreover, if we were to assume, for the sake of argument, that Tillinghast declined to consider some of these factors in its actuarial analyses, petitioner has failed to show that Tillinghast acted improperly in this regard. We are unpersuaded that all of these "qualitative factors" should have been considered in estimating petitioner's unpaid losses for the years in issue. For instance, because petitioner did business only in Wisconsin during the years in issue, it is unclear why uncertainty regarding business in "new states" should enter into the estimation of unpaid losses for the years in issue.

Tillinghast ever explicitly refused to consider any particular factor in estimating petitioner's unpaid losses.

Furthermore, there is no evidence in the record of any actuarial standard that supports an "implied range" of plus or minus 10 percent around an actuary's point estimate. To the contrary, Reichle testified that although the concept of an implied range of reasonableness is consistent with the uncertainty inherent in any particular point estimate of unpaid losses, it is impossible to quantify generally how wide such a range would be, since the width of the range would depend upon the confidence level demanded.[19]

Reichle testified somewhat tentatively that "I guess in the case at hand, our view was that * * * If a company carried a reserve in their annual statement within ten percent of our estimate, * * * that was reasonable." Reichle also testified, however, that any such implied range had to be determined on a "company-by-company and case-by-case basis" and that he "wouldn't want to quite generalize it * * * within the industry and that kind of thing". Reichle offered no specifics as to what factors he might have considered in arriving at a conclusion that a 10-percent implied range was reasonable in the instant case or what confidence level such a range might imply. Consequently, the

---

[19] In other words, the width of the implied range would approach infinity as the confidence level approached zero.

evidence is inadequate for us to assess the reasonableness of any conclusion by Tillinghast as to a 10-percent implied range around their point estimate. In any event, the evidence does not establish that Tillinghast contemporaneously communicated with petitioner about any such implied range.[20]

Sanders testified that, in his opinion, it was reasonable for petitioner to select unpaid loss estimates on the basis of an implied range of plus or minus 10 percent, but that he knew of no actuarial standard of practice or guideline that suggests such a 10-percent tolerance. Although Sanders identified various factors that might support a 10-percent tolerance, he admitted on cross-examination that he did not know to what extent Tillinghast had actually considered such factors in selecting its point estimates or whether petitioner had considered such factors in increasing Tillinghast's point estimates by approximately 10 percent.

The AMI report addressed only petitioner's 1993 (and not its 1994) unpaid losses. The AMI report concluded that petitioner's 1993 unpaid loss reserves were at the "low end" of a reasonable range. Respondent's experts, Kilbourne and Otto, concluded that the AMI report contained errors that caused its 1993 unpaid loss

---

[20] Kurt Reichle testified that he could not recall that Tillinghast ever communicated such an implied range to petitioner. Similarly, Maurer testified that he could not recall specific conversations that he had with anyone at Tillinghast about such an implied range.

estimates to be significantly overstated. Petitioner's rebuttal
expert, Hurley, concurred with key aspects of Kilbourne's and
Otto's criticisms of the AMI analysis and opined that if the AMI
analysis were adjusted to reflect certain of their criticisms,
the AMI point estimate for 1993 unpaid losses would be reduced to
$71,915,000--an amount slightly below Tillinghast's 1993 point
estimate.[21] In light of Hurley's conclusions, the AMI report
does not support petitioner's add-ons to Tillinghast's 1993 and
1994 point estimates.

Coopers never expressly opined that petitioner's unpaid loss
estimates were reasonable. To the contrary, for each of the
years in issue, Coopers concluded that petitioner's estimates of
its unpaid losses fell outside a reasonable range suggested by
Coopers's in-house guidelines. Ultimately, Coopers decided to

---

[21] To be more precise, James Hurley (Hurley) agreed with
Frederick Kilbourne (Kilbourne) and David Otto (Otto) that the
AMI report contained certain errors, the adjustment of which
would reduce the AMI point estimate by $4,875,000 to $82,544,000.
Hurley noted that if the AMI analysis were adjusted to account
for certain other of Kilbourne's and Otto's criticisms, which
Hurley opined involved "matters of actuarial judgment", the AMI
point estimate should be reduced by $15,504,000 to $71,915,000.
Hurley did not expressly align himself with the actuarial
judgment of either AMI or Kilbourne and Otto. We note, however,
that Hurley computed the effect of a corresponding adjustment for
this issue, while declining to offer a corresponding adjustment
for another of Kilbourne's and Otto's criticisms of the AMI
analysis, which Hurley characterized as involving "purely
actuarial judgment". We infer that Hurley recognized merit in
those criticisms raised by Kilbourne and Otto for which he
computed corresponding adjustments. Accordingly, to that extent,
we construe Hurley's report as corroborating Kilbourne's and
Otto's criticisms of the AMI analysis.

override these in-house guidelines and to require no adjustment to petitioner's annual statement estimates, largely because Coopers did not consider the effects of any overstatement of these estimates to be "significant" for financial disclosure purposes.[22]   The mere fact that a potential overstatement in unpaid loss estimates is not deemed significant or material for financial statement purposes, however, does not mean that the estimates are fair and reasonable within the meaning of the applicable regulations.  In fact, Coopers specifically noted that the "impact on current year net income is significant".  Of course, failure to clearly reflect net income is at the heart of our concerns here.

Regarding petitioner's 1994 financial statements, Coopers noted that "A portion of the reserve redundancy is maintained to offset potential tax exposure" relating to IRS audits of petitioner for prior years.  This comment strongly suggests that petitioner's estimates of its unpaid losses did not comprise "only actual unpaid losses" on its insurance contracts, as required by the applicable regulations.  Sec. 1.832-4(a)(5) and (b), Income Tax Regs.; see State of Md. Deposit Ins. Fund v.

---

[22] Among the reasons stated for the Coopers & Lybrand decision that no unpaid loss adjustments were required for petitioner's financial statements were the following:  "The impact on retained earnings (slightly over 5%) is not considered overly significant"; there would be no "significant impact" on bonus plans; and petitioner "is not publicly traded and there is currently no active market for the existing shares."

<u>Commissioner</u>, 88 T.C. at 1059.

In sum, petitioner has failed to establish that its selection of unpaid loss estimates almost 10 percent greater than its actuary's point estimates was based on reasonable methods or assumptions. Cf. <u>Hospital Corp. of Am. v. Commissioner</u>, T.C. Memo. 1997-482 (insurance company failed to establish the reasonableness of unpaid losses where it relied upon the extrapolation of a recommended range from fixed dollar values contained in its actuary's reserve analysis reports). Accordingly, petitioner has failed to establish that its estimates of unpaid losses, insofar as they include the almost 10-percent add-ons to Tillinghast's point estimates, are fair and reasonable within the meaning of the applicable regulations.

<u>Determination of Fair and Reasonable Estimates of Unpaid Losses</u>

Respondent's experts' estimates of petitioner's unpaid losses differ in amount not only from Tillinghast's point estimates but also (by a smaller margin) from respondent's determinations in the statutory notice.[23]  Contending broadly

---

[23] The unpaid loss estimates selected by Tillinghast, respondent (in the statutory notice), and respondent's experts were as follows:

| Year | Tillinghast Point Estimates | Respondent's Determinations | Respondent's Experts |
|------|------|------|------|
| 1993 | $74,027,009 | $46,508,000 | $50,000,000 |
| 1994 | 77,029,796 | 45,549,000 | 39,000,000 |

that his experts' estimates confirm the estimates reflected in the statutory notice, respondent urges us to sustain his determinations.

On brief, respondent's primary criticism of Tillinghast's methodology relates to Tillinghast's use of "prior selections". Respondent's complaint, in essence, is that instead of calculating petitioner's unpaid losses by averaging the results indicated by the five specific actuarial methods that it employed, Tillinghast improperly inflated the final result by factoring in the higher ultimate loss estimates that Tillinghast had selected in the preceding year.

We are unpersuaded by respondent's criticisms of Tillinghast's actuarial methods.  Reichle and petitioner's experts offered credible testimony that the weighing of prior selections was standard practice in the industry and was justified in the present circumstances.[24]  The Coopers auditors determined that Tillinghast's estimates and assumptions were reasonable.  On the basis of the record before us, we decline to second-guess Tillinghast's professional judgment that consideration of prior-year loss estimates was a reasonable guard against overoptimism where trends in medical malpractice

---

[24] For example, Owen Gleeson testified that it would not have been reasonable for Tillinghast to have stopped with the results derived from its five specific actuarial methods, and that it was "necessary" for Tillinghast to consider its prior selections.

experience had recently reversed course from unfavorable to favorable, and where there was uncertainty about the credibility of some of petitioner's current data.[25]  Tillinghast's use of prior selections appears to be analogous to the so-called lookback method that we found to be proper in Utah Med. Ins. Association v. Commissioner, T.C. Memo. 1998-458.

In attacking Tillinghast's use of prior selections, respondent relies on the Kilbourne Co. report, which states that "As a matter of actuarial science" Tillinghast's reliance on prior selections was not justified, especially given that petitioner's unpaid loss reserve redundancies were higher than the industry norm.  The general tenor of the Kilbourne Co. report is adversarial toward Tillinghast, accusing Tillinghast of consciously violating various actuarial precepts.[26]  Otto testified that Tillinghast's estimates reflected a conscious

---

[25] Respondent makes much of the fact that Tillinghast gave its prior selections greater weight in 1994 than in 1993.  The evidence shows, however, that the increased weight for prior selections in 1994 was explained by facts specific to 1994, including changes in petitioner's incidence reporting and restatements of petitioner's data bases that caused Tillinghast to have greater uncertainty about the integrity and credibility of petitioner's current data in 1994.

[26]  The Kilbourne Co. report states, for instance, that Tillinghast "manipulated their actuarial methods through the process of relying on 'prior selections' in a manner that cannot be supported by the data."  Similarly, the Kilbourne Co. report states that in making its actuarial estimates, "Tillinghast introduced additional and extraneous calculations which we believe we can show were intended to incorporate margins (i.e. excessive amounts) into the unpaid losses."

decision to overstate petitioner's reserves.  At trial, however, Otto conceded that he had no basis for this conclusion, except that his actuarial analysis differed from Tillinghast's.

We believe that Otto's unsupported accusations and the generally adversarial tone of the Kilbourne Co. report are more indicative of advocacy than of the "detached neutrality" we demand of expert witnesses.  See Estate of Halas v. Commissioner, 94 T.C. 570, 577-579 (1990).  The usefulness and credibility of respondent's experts are accordingly diminished, and we give their opinions little weight in this regard.  See, e.g., Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980); Anclote Psychiatric Ctr., Inc. v. Commissioner, T.C. Memo. 1998-273; Podd v. Commissioner, T.C. Memo. 1998-231.

We are also unpersuaded by respondent's contentions that petitioner's estimates of unpaid losses were unreasonable because they proved, in hindsight, excessive.  As this Court stated in Utah Med. Ins. Association v. Commissioner, supra:  "Petitioner's reserves for unpaid losses must be fair and reasonable, but are not required to be accurate based on hindsight."  The evidence shows that Tillinghast took into account developing redundancies in establishing the estimates in question.  Cf. Minnesota Lawyers Mut. Ins. Co. v. Commissioner, T.C. Memo. 2000-203 (taxpayer failed to show that it took prior favorable experience into account in establishing adverse development reserves).

Conclusion

On the basis of all the evidence, we conclude and hold that the best estimates of petitioner's unpaid losses for the years in issue are Tillinghast's point estimates--i.e., $74,027,009 for 1993 and $77,029,796 for 1994.

We have considered all other arguments that the parties have advanced for different results and find them to be moot, irrelevant, or without merit.

To reflect the foregoing and concessions by the parties,

Decision will be entered

under Rule 155.